**The STATE OF NEW YORK and Thomas C. Jorling, as Trustee of the Natural Resources, Plaintiffs,**

v.

**LASHINS ARCADE CO., Lashins Arcade Corp., Rocco Tripodi, Bedford Village Cleaners, Inc., and Rocco Astrologo, Defendants.**

No. 92 Civ. 8771 (CLB).

United States District Court, S.D. New York.

May 12, 1994.

---

Nancy Sterns, New York State Dept. of Law, New York City, for plaintiffs.

Sive, Paget & Riesel, P.C., New York City, Plunkett & Jaffe, White Plains, NY, for defendants.

*Memorandum & Order*

BRIEANT, District Judge.

Plaintiffs, the New York State Department of Environmental Conservation ("NYSDEC") and Thomas C. Jorling, Trustee of New York State's natural resources pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(f)(2)(b), seek partial summary judgment holding Defendant Lashins Arcade Co., a limited partnership, ("Defendant Lashins"), liable under § 107(b)(3) of CERCLA (seventh claim) and under the common law of nuisance (eighth claim). Specifically, the State seeks partial summary judgment holding Defendant Lashins strictly, and jointly and severally liable for all costs, including attorney fees and other costs of enforcement incurred by the State in responding to the release or threat of release of hazardous substances and in abating pub-

lic nuisance and for all damages to the natural resources of the State sustained as a result of the release of tetrachloroethylene, 1, 2–dichloroethylene (DCE) and trichloroethylene (trichloroethene or TCE) found in the groundwater in the vicinity of the Bedford Village Shopping Arcade ("Shopping Arcade").

Defendant Lashins also seeks summary judgment in its favor based on its affirmative defense under CERCLA § 107(b)(3) and dismissal without prejudice of the common law nuisance claim.

The Shopping Arcade, a 6,800 square foot one story building with six retail stores, was built in 1955. The Shopping Arcade was owned by Holbrook B. Cushman (who is not a party to this suit) until his death in 1966. Mr. Cushman leased a store at the Shopping Arcade to defendant Rocco Astrologo ("Mr. Astrologo"), and later to defendant Rocco Tripodi ("Mr. Tripodi"). Mr. Astrologo operated a dry cleaning establishment in that store in the Shopping Arcade from in 1958 to 1963. From 1963 to 1971, Mr. Tripodi operated the same business, defendant Bedford Village Cleaners, Inc. d/b/a/ Village Cleaners and Tailors ("Village Cleaners"), a New York corporation. Any discharge into the aquifer of these hazardous substances commonly associated with dry cleaning was done by one or both of these dry cleaning tenants, the last of which had left the Shopping Arcade in 1971.

After the death of Mr. Cushman in 1966, the Shopping Arcade was held in trust by Beatrice Cushman and the Bank of New York until November 1972. In November 1972, the trust sold the Shopping Arcade to Miriam Baygell who owned it until her death in 1977, when her husband Milton Baygell (who is not a party to this suit) inherited the Shopping Arcade.

On April 6, 1987, Mr. Lashins signed a contract of sale between Milton G. Baygell as seller and Edward A. Lashins, Inc. as purchaser. On April 24, 1987 that contract was assigned to Lashins Arcade Corp., a New York corporation. On June 26, 1987, Mr.

Baygell conveyed the property through his corporate vehicle, Deferred Holding Co., Inc., to defendant Lashins Arcade Corp. which, on the same day, transferred title to Defendant Lashins Arcade Co. ("Defendant Lashins"), a New York limited partnership.

*Factual Background*

In 1978, the Westchester County Department of Health ("WCDOH") had conducted a county-wide survey regarding possible groundwater contamination by volatile organic chemicals ("VOCs"). The WCDOH found such contamination in the drinking water in wells in the hamlets of Katonah, Armonk and Bedford Village. Wells near the Shopping Arcade were contaminated with varying amounts of tetrachlorethylene, 1, 2–dichloroethene (DCE) and trichloroethylene (trichloroethene or TCE). These chemicals are believed to be carcinogens.

The WCDOH issued "boil water" notices to affected homeowners and directed property owners to install granulated activated carbon ("GAC") filters.

In 1982, the NYSDEC began an informal administrative proceeding pursuant to the Environmental Conservation Law ("ECL"), Article 27, Title 13 which authorized state funds for an investigation and remediation of the groundwater in the area of the Shopping Arcade and the nearby Hunting Ridge Shopping Mall. In June 1983, a NYSDEC consultant, Wehran Engineering Co. performed a DEC Phase I investigation and found the highest concentration of contaminants in the Shopping Arcade area formerly occupied by the dry cleaners. Upon completing its Phase I investigation pursuant to ECL, Article 27, Title 13, the DEC designated the Shopping Arcade and the Hunting Ridge Shopping Mall as the "Bedford Village Wells" site ("the site") on the New York State Registry of Inactive Hazardous Waste Disposal Sites, No. 3–60–006. Exhibit F, Doc. 24, Lashins Affidavit.[1]

In June 1985, the DEC conducted its Phase II investigation of the site which showed continued presence in the water, or

---

1. Prior to June 1987, a site's listing on the Registry or its subsequent reclassification was neither published in a newspaper of general circulation, posted in public places, nor indexed at county clerk's offices.

"release" of volatile organic chemicals. In 1986, WCDOH and the United States Environmental Protection Agency ("EPA") confirmed that VOCs existed in additional private wells and public water supply wells located east and southeast of the site which were not previously contaminated.

By letter dated, March 20, 1987 (before the contract of sale was signed by Lashins on April 6, 1987), Donald Mazin, Esq., attorney for Mr. Baygell, informed Henry Hocherman, Esq., attorney for Lashins: "[t]hat there are chemicals in the ground being treated by ultra violet and activated carbon machines situated in the rear of the building to clean the water. Chemicals have to be replaced approximately every 8–9 months." In June 1987, a water service contractor from Environmental Recovery Co. told Mr. Lashins that the GAC filters were required because there was an area-wide groundwater contamination which he believed was caused by an Exxon gas station adjacent to the Shopping Arcade.

In July 1987, the NYSDEC, under contract with Dvirka and Bartilucci Consulting Engineers (D & B), conducted a State-funded Remedial Investigation/Feasibility Study (RI/FS) D & B analyzed available date (Exhibit B, Remedial Investigation at p. 1–6, Doc. 24) and made the following conclusions:

> The organic chemicals identified in the contaminated wells were primarily tetrachloroethene, trichloroethene and cis–1, 2–dichloroethene. The source of these organic compounds, although unconfirmed, most probably originated from a former dry cleaning establishment located in the Shopping Arcade.

> Additional sampling in the surrounding area has shown only trace amounts of contaminants or non-detectable levels of the same compounds. The extent of significant ground water contamination appeared to be limited to the area of and immediately contiguous to the Shopping Arcade in the vicinity of the suspected source....

> Since boring logs and water levels were not available at the site, ground water flow direction and the extent of the contaminant plume was to be determined by installing borings and constructing monitoring wells as part of this Remedial Investigation.... As mentioned previously, although it appears that levels of ground water contamination have been generally declining, preliminary analysis of the data obtained from 1982 to 1986 does not indicate a clear trend of declining contamination for all wells. Based on this information, it was suspected that sources (including contaminated soils) may be continuing to release organic chemicals to the surrounding environment.

This study was completed in February 1990.

The NYSDEC issued a Record of Decision ("ROD") on March 30, 1990 setting forth the DEC's response actions to abate and remedy the actual and threatened releases of hazardous substances from the Shopping Arcade. The ROD suggested three remedial programs: 1) installation of GAC filters for the homes and businesses affected (which were already in place since 1985); 2) a new source of water supply; and (3) re-charge of the contaminated ground water by a "pump and treat" system. In 1991, a Remedial Design and Remedial Action ("RD/RA") was initiated and further studies were conducted in order to implement the ROD. In June 1993, Jeff McCullough, who was the DEC project manager for the site's remediation study, stated that "the areas in question are still contaminated at somewhat lower but comparable levels as they were found during the [Remedial Investigation]." McCullough Deposition, Exhibit A of Riesel Affidavit, Doc. 40. This lawsuit was filed on December 7, 1992.

■■■ Summary Judgment shall be granted "if the [papers] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The movant "always bears the initial responsibility of informing the district court of the basis of its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). All factual inferences "must be viewed in the

light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). However, an opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. In order to defeat a summary judgment motion, the nonmoving party "need only present evidence from which a jury might return a verdict in [its] favor." *Anderson* at 257, 106 S.Ct. at 2514.

Our Court of Appeals has held that "a court's ultimate role in considering a motion for summary judgment is not to resolve disputed issues, but only to determine whether there is a genuine and material issue for trial." *Hudson Hotels Corp. v. Choice Hotels International, Inc.*, 995 F.2d 1173, 1175 (2d Cir.1993); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986).

*Discussion*

 CERCLA provides recovery to the state for "all costs of removal or remedial action" from certain responsible parties subject to enumerated affirmative defenses. 42 U.S.C. § 9607. Liability under CERCLA is strict. To establish liability against a responsible party the State need establish only that:

1. the Shopping Arcade is a "facility";
2. a "release" or a threat of release of any "hazardous substance" from the site has occurred or is occurring;
3. a release or threatened release has caused the State to incur response costs.

Defendant Lashins is a responsible party under CERCLA § 107, namely "owner and operator" of the site. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992). *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985).

All elements of strict liability under CERCLA are satisfied in this case. With respect to affirmative defenses, CERCLA § 107(b)(3) provides in relevant part as follows:

(b) Defenses

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of hazardous substance and the damages resulting therefrom were caused solely by—

\* \* \* \* \* \*

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeable result from such acts or omissions; or

\* \* \* \* \* \*

Defendant Lashins had no direct or indirect contractual relationship with either of the third party dry cleaners who released the VOCs, or with the owners of the Shopping Arcade at the time the dry cleaners operated and when the pollution occurred.

 This Court concludes that it is appropriate to construe CERCLA under the conceded facts as providing a valid affirmative defense to strict liability for a subsequent purchaser who did everything that could reasonably have been done to avoid or correct the pollution, where the discharges by the dry cleaners presumably causing the pollution occurred fifteen years prior to the purchase, and where the amount of pollutant declined since the purchaser bought the property. To do otherwise would stretch the words of the statute beyond their limits. *Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp.*, 964 F.2d 85 (2d Cir.

**158**

1992).[2] A broadly phrased statute, like CERCLA must be interpreted to promote its objectives:

> To decide, we turn to the words . . . read in their historical setting as revealing the purpose of its framers, and search for admissible meanings of its words which, in the circumstances of their application, will effectuate those purposes.

*United States v. Classic*, 313 U.S. 299, 317–318, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1941).

■ The historic background for antipollution statutes is a public demand that everything feasible be done to prevent and clean up hazardous materials and avoid harm they cause. Avoidance of unfair surprise to a non-wrongdoer is also an important objective. *See generally Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 16 (2d Cir. 1993). Under all the circumstances, the purposes of the law would not be served by finding liability. To find liability under these circumstances would mean that sites long ago abused by original owners would become unsalable and open to neglect because no one would dare to acquire them, even if nothing further could be done by a new owner to stop the passage through the aquifer of ancient emissions from a long since closed dry cleaning store. *See, United States v. A & N Cleaners*, 788 F.Supp. 1317, 1322 (S.D.N.Y. 1992). As our Court of Appeals held, "[H]ad Congress intended to place the defense provided for in [§ 107(b)3] beyond the reach of a particular class of defendants it knew precisely how to do so." *Westwood Pharmaceutical, Inc. v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 90 (2d Cir.1992).

A fifteen year lapse of time between the problem-causing events and purchase by defendant Lashins makes it most unlikely that the original owner could have profited by attempting to sell the property free of risk to the new owner because of anticipation of a ruling such as that made here. No risk of encouraging such fly-by-night behavior is therefore encouraged by the decision made here. *See generally Olin,* 5 F.3d 10, 16 (2d Cir.1993).

■ The length of the delay, as well as questions of prejudice caused by, and responsibility for the delay, while not independently controlling, are highly relevant to all legal doctrines flowing from it—especially in the light of what if anything occurred during the lapsed time (here, no indication of further risk, and fulfillment of all reasonable precautions). *See Robins Island Preservation Fund v. Southold Development Corp.*, 959 F.2d 409 (2d Cir.), *cert. denied* — U.S. —, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992).

It is hardly part of the "bundle" of rights and obligations, *Lucas v. South Carolina Coastal Council,* — U.S. —, —, 112 S.Ct. 2886, 2889, 120 L.Ed.2d 798 (1992), acquired by a purchaser of real property, that he or she may be compelled by pay open-ended costs due to events brought about by others fifteen years before the purchase, and for which the seller was not directly responsible. This is so especially where, as here, the purchaser has taken all reasonable steps to avoid risks caused by a formerly deposited hazardous substance, the background levels of which have continued to decline.

For these reasons, defendant's summary judgment motion based on the affirmative defense of § 107(b)(3) is granted and the state's claims are dismissed as against the Lashins defendants.

The Court declines at this time to make the finding contemplated by rule 54(b) F.R.Civ.P. A Case Management Conference will be held on June 21, 1994 at 9:00 a.m..

SO ORDERED.

---

2. *See* the late Judge Weinfeld's analysis that "a primary intent of CERCLA was to provide claims against those responsible for the generation, transportation and disposal of hazardous waste . . ." *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 614 (S.D.N.Y.1986).