91 F.3d 353
 43 ERC 1001, 65 USLW 2159, 26 Envtl.
L. Rep. 21,506
 STATE OF NEW YORK and Thomas C. Jorling, as Trustee of the
Natural Resources, Plaintiffs-Appellants-Cross-Appellees,
v.
LASHINS ARCADE CO. and Lashins Arcade Corp.,
Defendants-Appellees-Cross-Appellants,
Rocco Tripodi, Bedford Village Cleaners, Inc., and Rocco
Astrologo, Defendants-Appellees.
 No. 926, Docket 95-7716.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 14, 1996.
Decided Aug. 5, 1996.
 
 Robert Emmet Hernan, Assistant Attorney General of the State of New York, New York City (Dennis C. Vacco, Attorney General, Victoria A. Graffeo, Solicitor General, Peter H. Schiff, Deputy Solicitor General, J. Jared Snyder, Assistant Attorney General, New York City, of counsel), for Plaintiffs-Appellants-Cross-Appellees.
 Daniel Riesel, New York City (Steven Russo, Sive, Paget & Riesel, P.C., New York City, Joel Sachs, Keane & Beane, P.C., New York City, of counsel), for Defendants-Appellees-Cross-Appellants.
 Before: MAHONEY, WALKER, and CALABRESI, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiffs-appellants-cross-appellees the State of New York and Thomas C. Jorling, as trustee of the State of New York's natural resources[1] (collectively "New York"), appeal from a final judgment entered June 20, 1995 in the United States District Court for the Southern District of New York, Charles L. Brieant, Judge, that granted summary judgment to defendants-appellees-cross-appellants Lashins Arcade Company and Lashins Arcade Corporation (collectively "Lashins") and denied New York's motion for summary judgment in this action brought under § 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a),[2] the common law of public nuisance, and § 841 of the New York Real Property Actions and Proceedings Law (which provides for a statutory action for nuisance), and for unjust enrichment and restitution. The complaint sought, inter alia, damages for costs New York incurred investigating and cleaning up the release of tetrachloroethene, or perchloroethylene ("PCE"), and its breakdown compounds, trichloroethene ("TCE"), 1,2-dichloroethene ("DCE"), and vinyl chloride, into the groundwater in the vicinity of the Bedford Village Shopping Arcade (the "Arcade") in Westchester County, New York. PCE is a chemical used as a solvent in dry cleaning operations.
 
 
 2
 The district court awarded Lashins summary judgment based upon the third-party defense provided by § 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3),[3] and dismissed the action "as against the Lashins defendants." New York v. Lashins Arcade Co., 856 F.Supp. 153, 158 (S.D.N.Y.1994). The court subsequently denied New York's motion to strike a jury demand made by defendant Rocco Astrologo, New York v. Lashins Arcade Co., 881 F.Supp. 101 (S.D.N.Y.1995), and denied New York's motion for reargument on the jury trial issue, New York v. Lashins Arcade Co., 888 F.Supp. 27 (S.D.N.Y.1995).
 
 
 3
 On this appeal, New York contests not only the dismissal of its claims against Lashins, but also the interlocutory decisions of the district court with respect to the jury trial issue. Lashins cross-appealed from the district court's approval of consent decrees entered between New York and the other defendants, which settled New York's claims against those defendants, but has since withdrawn its cross-appeal.[4]
 
 
 4
 We affirm the judgment of the district court.Background
 
 
 5
 This appeal involves the release of hazardous substances at the Arcade, which resulted in groundwater contamination in the area. The Arcade, a 6,800 square foot one-story building housing six retail stores, was built in 1955, and was owned by Holbrook B. Cushman until his death in 1966. Lashins Arcade Co., 856 F.Supp. at 155. The property was then held in trust by Cushman's widow, Beatrice Cushman, and the Bank of New York until 1972. Id. Cushman leased a store in the Arcade to Astrologo from about 1958 to 1963, where Astrologo operated a dry cleaning business. Id. The store was next leased to defendant Rocco Tripodi (with whom defendant Bedford Village Cleaners, Inc. is affiliated) in 1963, who maintained the dry cleaning business at the Arcade until 1971. Id. During this period, Tripodi dumped powdered wastes from his dry cleaning machines, which contained the volatile organic compound ("VOC") PCE, on the ground outside the Arcade behind his store. In December 1971, Tripodi moved his dry cleaning business out of the Arcade, and no other dry cleaning establishment has operated there since that time. In November 1972, the trust sold the Arcade to Miriam Baygell, who owned the property until her death in 1977, when it was inherited by her husband, Milton Baygell. Id.
 
 
 6
 In 1978, the Westchester County Department of Health (the "WCDOH") conducted a countywide survey regarding possible groundwater contamination by VOCs. Id. The survey found elevated VOC levels in the hamlets of Katonah, Armonk, and Bedford Village. Id. Further sampling of private wells in Bedford Village conducted by the WCDOH in 1979 revealed groundwater contamination in an area southeast of the Arcade. These samples contained high concentrations of PCE and its breakdown compounds, TCE and DCE. The WCDOH issued "boil water" notices to affected homeowners. Id.
 
 
 7
 In 1982, the New York State Department of Environmental Conservation (the "NYSDEC") authorized state funds for an investigation and remediation of the groundwater problem at the Arcade and the nearby Hunting Ridge Shopping Mall pursuant to § 27-1301 et seq. of the New York Environmental Conservation Law. Lashins Arcade Co., 856 F.Supp. at 155. The investigations conducted from 1982 to 1986 revealed fluctuating levels of VOC contamination in the wells adjacent to the Arcade. Id. at 155-56. A "Phase I" investigation, completed in June 1983 by the Wehran Engineering Company ("Wehran"), reported that the highest level of contamination in the Arcade was found in the area formerly occupied by the dry cleaning establishment.
 
 
 8
 Following the Phase I investigation, the "Bedford Village Wells" site was listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites (the "Registry"). The Registry is published annually by the NYSDEC pursuant to § 27-1305(1) of the New York Environmental Conservation Law, which requires the NYSDEC annually to "transmit a report to the legislature and the governor identifying every inactive hazardous waste disposal site in the state known to the [NYSDEC]." Id. (McKinney 1996 Supp.). The registered sites are prioritized based upon "the relative need for action at each site to remedy environmental and health problems resulting from the presence of hazardous wastes at such sites." N.Y.Envtl.Conserv.Law § 27-1305(4)(b) (McKinney 1996 Supp.). In the 1983 Registry, the Bedford Village Wells site was designated as a Class "2a" site, based in part upon information that disposition of dry cleaning solvents had probably occurred at the Arcade. Class "2a" sites are those that are suspected to be hazardous waste disposal sites, but which require further investigation to confirm the presence of hazardous wastes. This site was described as including the Arcade, the Hunting Ridge Shopping Mall, an Exxon gasoline station, the Bedford Theater Building, and an apartment building adjacent to the theater. In December 1987, the Arcade was separated from the Hunting Ridge Shopping Mall, and each was thereafter designated as a separate site in the Registry.
 
 
 9
 By letter dated October 12, 1983 and addressed to Miriam Baygell (who by that time was deceased), the NYSDEC advised that it intended to conduct a Phase II investigation of the Bedford Village Wells, and also stated that Ms. Baygell had the right to conduct such an investigation herself. Milton Baygell did not respond to this letter, which he may never have received. In any event, Wehran conducted the Phase II fieldwork for the NYSDEC commencing in 1984, and reported its final conclusions in June 1985. During this period, the WCDOH requested in a letter to Milton Baygell dated March 6, 1984 that he install a granular activated carbon ("GAC") filter in the well supplying the Arcade with water to remedy the VOC problem; Baygell installed the GAC filter in May 1985.
 
 
 10
 The final Phase II Report concluded that VOC contamination persisted at the Arcade site. It also stated that although the Hunting Ridge Shopping Mall was located just 4,000 feet southwest of the Arcade, the groundwater contamination at the two sites was probably not related. As a result of these findings, the Bedford Village Wells Site was reclassified from Class "2a" to Class "2" in the 1986 Registry. A Class "2" site is defined as a "[s]ignificant threat to the public health or environment--action required." N.Y.Envtl.Conserv.Law § 27-1305(4)(b)(2) (McKinney 1984); see also id. 1995 supplementary practice commentary (McKinney 1996 Supp.). Milton Baygell was informed about the reclassification in a certified letter for which he signed a receipt on June 20, 1986.
 
 
 11
 In 1986, the United States Environmental Protection Agency (the "EPA") joined with the WCDOH to investigate the Arcade. Their joint surveys confirmed that VOCs persisted in three private wells at the Bedford Village Wells site, and low VOC concentrations also appeared east and southeast of the Arcade in water supplies that had previously been uncontaminated. In view of this problem, the NYSDEC requested and obtained approval from the EPA for a Remedial Investigation/Feasibility Study ("RI/FS") of the entire Bedford Village Wells site. The NYSDEC retained Dvirka and Bartilucci Consulting Engineers ("Dvirka and Bartilucci") to perform the RI/FS in December 1986, and the firm began its field work the following summer.
 
 
 12
 Meanwhile, in January 1987, Milton Baygell entered into negotiations with Lashins for the sale of the Arcade after a real estate broker contacted Lashins about the property. In the course of these negotiations, Baygell's attorney, Donald Mazin, wrote Lashins' attorney, Henry Hocherman, on March 20, 1987 to inform him that "there are chemicals in the ground being treated by ultra violet and activated carbon machines situated in the rear of the building to clean the water. Chemicals have to be replaced approximately every 8-9 months." Lashins Arcade Co., 856 F.Supp. at 156.[5] Prior to executing the contract of sale, Lashins contacted the Arcade's water service contractor, Environmental Recovery Co., who advised Lashins that the well on the premises had a water filter, but assured Lashins that the filter was "routine" and had been installed in response to an area-wide groundwater contamination problem, and that the suspected source of the contamination was a nearby Exxon gas station.
 
 
 13
 In addition, Lashins states that it contacted the Town of Bedford prior to purchasing the Shopping Arcade to determine whether there were any violations or other present or past problems with the property, and was assured that there were none. Lashins further asserts that it interviewed the Arcade's tenants, all of whom spoke enthusiastically about the property. New York contends, however, that Lashins made no inquiry concerning the groundwater contamination (other than the discussion with Environmental Recovery Co.) prior to purchasing the Arcade. In any event, Lashins executed a contract of sale with Baygell on April 6, 1987, id., and the transaction closed on June 26, 1987.
 
 
 14
 Lashins claims that at the time of the closing, it was unaware that the NYSDEC was conducting an administrative proceeding involving the Arcade, or that it had contracted with a firm to conduct the RI/FS concerning the Bedford Village Wells site. Baygell did not transmit any NYSDEC notices to Lashins, no public notice was issued, and the Arcade tenants, the Town of Bedford, and the local bank were allegedly unaware of the situation.
 
 
 15
 Lashins was first informed that the NYSDEC was conducting a formal investigation of the Arcade by letter dated August 13, 1987. That letter advised Lashins of the impending RI/FS requested by the NYSDEC, and stated that NYSDEC representatives intended to enter the Arcade property "for the purpose of drilling, installing and operating groundwater monitoring wells and taking samples of soil, septage, surface water, and groundwater."
 
 
 16
 New York also informed Milton Baygell of the RI/FS by letter dated September 18, 1987, which stated that:
 
 
 17
 New York State ... has documented a release of "hazardous substances" ... at property known as the Bedford Village Wells--Shopping Arcade Site in the Town of Bedford....
 
 
 18
 The State intends to insure that the full extent of contamination at and around the site is thoroughly investigated and studied. It then intends to insure that the contamination is remediated. The NYSDEC has contracted with Dvirka and Bartilucci Consulting Engineers of Syosset, New York to conduct a[n] [RI/FS] at the Shopping Arcade Site. This RI/FS is expected to be completed within the next twenty-two (22) months.
 
 
 19
 Please be advised that, if it is found that the Shopping Arcade building is found to be a source of contamination in the Bedford Village Wells, the State will institute appropriate legal action against you [Baygell], as previous owner of the Shopping Arcade building, to recover its past and future removal and remediation response costs, as well as damages for harm to natural resources.
 
 
 20
 After purchasing the Arcade, Lashins maintained the existing GAC filter and took water samples which were analyzed by a laboratory for VOC contamination on a semi-annual basis. It also instructed all tenants to avoid discharging any hazardous substances into the waste and septic systems, subsequently incorporated this requirement into the tenant leases, and conducted periodic inspections of the tenants' premises to assure compliance with this obligation.
 
 
 21
 The RI/FS was completed in February 1990. It concluded, inter alia, that the contamination in the affected wells,
 
 
 22
 "although unconfirmed, most probably originated from a former dry cleaning establishment located in the Shopping Arcade.
 
 
 23
 ... The extent of significant ground water contamination appeared to be limited to the area of and immediately contiguous to the Shopping Arcade....
 
 
 24
 ....
 
 
 25
 ... [A]lthough it appears that levels of ground water contamination have been generally declining, preliminary analysis of the data obtained from 1982 to 1986 does not indicate a clear trend of declining contamination for all wells. Based on this information, it was suspected that sources (including contaminated soils) may be continuing to release organic chemicals to the surrounding environment."
 
 
 26
 Lashins Arcade Co., 856 F.Supp. at 156 (quoting RI/FS).
 
 
 27
 The NYSDEC issued a Record of Decision on March 30, 1990 setting forth its plan to abate and remedy the actual and threatened release of hazardous substances from the Arcade. Id. Three remedial measures were suggested: (1) installation of GAC filters (which were already in place) for the affected homes and businesses; (2) a new source of water supply; and (3) re-charge of the contaminated ground water by a "pump and treat" system. Id. Further studies were conducted to implement this Record of Decision, and in June 1993 the project manager for the Arcade remediation study stated that " 'the areas in question are still contaminated at somewhat lower but comparable levels as they were found during the [Remedial Investigation].' " Id. (quoting deposition testimony) (alteration in Lashins Arcade Co.).
 
 
 28
 New York filed this action on December 7, 1992, id., alleging violations of § 9607(a) and state law by Lashins and its codefendants as previously described. In October 1993, Lashins and New York filed opposing motions for summary judgment on the issue of Lashins' liability under CERCLA as a current owner of the Arcade. The district court granted summary judgment for Lashins and dismissed the action with respect to Lashins on May 12, 1994. See Lashins Arcade Co., 856 F.Supp. at 158.
 
 
 29
 The district court concluded that all elements for strict liability as to Lashins under § 9607(a), supra note 2, were satisfied in this case, see Lashins Arcade Co., 856 F.Supp. at 157, but that Lashins was entitled to summary judgment on its affirmative defense under § 9607(b)(3), supra note 3, see Lashins Arcade Co., 856 F.Supp. at 157-58. In so ruling, the court noted that "Lashins had no direct or indirect contractual relationship with either of the third party dry cleaners who released the VOCs, or with the owners of the Shopping Arcade at the time the dry cleaners operated and when the pollution occurred," id. at 157, and that Lashins had done "everything that could reasonably have been done to avoid or correct the pollution," id.
 
 
 30
 As previously noted, consent decrees subsequently ensued with respect to Lashins' codefendants. Final judgment was accordingly entered on June 20, 1995. This appeal followed.
 
 Discussion
 
 31
 Because this is an appeal from a grant of summary judgment, "we review the record de novo, drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.) (collecting cases), cert. denied, --- U.S. ----, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996). These principles apply whether summary judgment is granted on the merits of a claim or, as in this case, on an affirmative defense. Bellsouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 609 (2d Cir.1996).
 
 
 32
 As an initial matter, there is no dispute that New York has established a prima facie case against Lashins under § 9607(a), supra note 2, for recovery of expenses incurred investigating and cleaning up the release of PCE at the Arcade. See Lashins Arcade Co., 856 F.Supp. at 157. This prima facie case consists of the following elements:
 
 
 33
 (1) the site in question is a "facility" as defined in [42 U.S.C. § 9601(9) ];
 
 
 34
 (2) the defendant is a responsible person under [§ 9607(a) ];
 
 
 35
 (3) a release or a threatened release of a hazardous substance has occurred; and
 
 
 36
 (4) the release or threatened release has caused the plaintiff to incur response costs.
 
 
 37
 Town of Munster v. Sherwin-Williams Co., 27 F.3d 1268, 1273 (7th Cir.1994) (citing Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 325 (7th Cir.1994)); see also New York v. Shore Realty Corp., 759 F.2d 1032, 1043 (2d Cir.1985); Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp., 847 F.Supp. 389, 395 (E.D.Va.1994).
 
 
 38
 Since Lashins is a current owner of the Shopping Arcade, it is a potentially responsible defendant under § 9607(a)(1), supra note 2, notwithstanding the fact that it did not own the Arcade at the time of disposal of the hazardous substances. See, e.g., Northwestern Mut. Life Ins. Co., 847 F.Supp. at 397. Thus, Lashins may be held strictly liable for New York's response costs unless it can satisfy one of CERCLA's affirmative defenses. See Shore Realty, 759 F.2d at 1042. We now turn to Lashins' claim that it may avoid such liability under the third-party defense of § 9607(b)(3).
 
 
 39
 Section 9607(b)(3), supra note 3, provides an affirmative defense for a party who can establish that the offending "release ... of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party," provided that: (1) the third party is not "one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant," (2) the defendant "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions," and (3) the defendant "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances."The offending release here was clearly caused by third parties (Tripodi, Bedford Village Cleaners, Inc., Astrologo, and (New York contends) Milton Baygell). Although paragraphs (1)-(3) of § 9607(b) speak exclusively in the singular, referring to events and damages "caused solely by--(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party," § 9607(b) (emphasis added), paragraph (4) of § 9607(b) refers to "any combination of the foregoing paragraphs," id., see supra note 3. We read paragraph (4) as allowing consideration of multiple causes within, as well as among, the several preceding paragraphs. Thus, in our view, damage that resulted from an earthquake and a subsequent flood would fall within paragraph (1) of § 9607(b), and damages caused by a number of acts by a single third party (as typically occurs when pollution is caused by a course of conduct), or a number of acts by several third parties (as in this case), would fall within paragraph (3). One case that involved acts of multiple third parties proceeded on the premise that their joint activities could provide exculpation under § 9607(b)(3), although without explicit analysis of the applicable statutory language. See City of New York v. Exxon Corp., 766 F.Supp. 177, 195 (S.D.N.Y.1991); cf. Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1079 n. 10 (1st Cir.1986) (paraphrasing § 9607(b)(3) to this effect).
 
 
 40
 In this case, the only one of the allegedly offending third parties with whom Lashins had a contractual relationship was Milton Baygell. Further, Baygell's allegedly offending conduct did not "occur in connection with a contractual relationship ... with [Lashins]" within the meaning of § 9607(b)(3), and therefore Lashins may not be disqualified from the protection afforded by § 9607(b)(3) because of its contractual relationship with Baygell.
 
 
 41
 This conclusion is mandated by the following ruling in Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp., 964 F.2d 85 (2d Cir.1992):
 
 
 42
 We hold that ... the phrase "in connection with a contractual relationship" in [§ 9607(b)(3) ] requires more than the mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed of and a third party whose act or omission was the sole cause of the release or threatened release of such hazardous substances into the environment, for the landowner to be barred from raising the third-party defense provided for in that section. In order for the landowner to be barred from raising the third-party defense under such circumstances, the contract between the landowner and the third party must either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's activities.
 
 
 43
 964 F.2d at 91-92.
 
 
 44
 In Westwood, the seller of the contaminated site sought exoneration from the buyer's conduct, whereas in this case the buyer seeks exoneration from the seller's activities, but this is surely an immaterial distinction in terms of the Westwood rationale. See id. at 89 ("[A] landowner is precluded from raising the third-party defense only if the contract between the landowner and the third party somehow is connected with the handling of hazardous substances."). The straightforward sale of the Arcade by Baygell to Lashins clearly did not "relate to hazardous substances" or vest Lashins with authority "to exert some element of control over [Baygell's] activities" within the contemplation of our ruling in Westwood.
 
 
 45
 The second requirement for the successful assertion of a third-party defense demands that the defendant shall have taken adequate precautions against actions by the third party that would lead to a release of hazardous waste. Given that the last release in the instant case happened more than fifteen years before Lashins' purchase of the Arcade, there was obviously nothing Lashins could have done to prevent actions leading to a release.
 
 
 46
 Thus, the resolution of this appeal turns upon the validity of the district court's ruling that Lashins was entitled to summary judgment on the question whether Lashins "exercised due care with respect to the hazardous substance concerned ... in the light of all relevant facts and circumstances" within the meaning of § 9607(b)(3). This requirement is not defined in the statute. CERCLA's legislative history, however, provides some guidance: "[T]he defendant must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 34 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6137. Further, "due care 'would include those steps necessary to protect the public from a health or environmental threat.' " United States v. A & N Cleaners & Launderers, Inc., 854 F.Supp. 229, 238 (S.D.N.Y.1994) (quoting H.R.Rep. No. 253, 99th Cong., 2d Sess. 187 (1986) U.S.Code Cong. & Admin.News 1986, 2835); see also Kerr-McGee Chem. Corp., 14 F.3d at 325 & n. 3 (due care not established when no affirmative measures taken to control site); Lincoln Properties v. Higgins, 823 F.Supp. 1528, 1543-44 (E.D.Cal.1992) (due care exercised where defendant removed contaminated wells).
 
 
 47
 Against this background, New York contends that Lashins inadequately investigated the contamination problem before buying the Arcade despite being notified about it, and after its purchase "did nothing to contain, control or clean up the pollution except to continue to maintain a filter on its own property."[6] New York points to cases such as A & N Cleaners and Kerr-McGee Chemical Corp. where § 9607(a) liability was imposed because the defendant did not take active measures to address a hazardous waste problem, and adds that Kerr-McGee Chemical Corp. and United States v. DiBiase Salem Realty Trust, Civ. A. No. 91-11028-MA, 1993 WL 729662 (D.Mass. Nov. 19, 1993), establish that the "due care" standard does not permit a landowner to remain passive simply because public environmental authorities are addressing a hazardous waste situation.
 
 
 48
 We are not persuaded by New York's arguments, nor by the authorities that New York cites to us. The pertinent language of § 9607(b)(3) focuses the "due care" inquiry upon "all relevant facts and circumstances" of the case at hand. In this case, the RI/FS by Dvirka and Bartilucci had been commissioned six months before Lashins purchased the Arcade, and before Lashins had even learned that the Arcade was for sale. It would have been pointless to require Lashins to commission a parallel investigation once it acquired the Arcade and became more fully aware of the environmental problem. Pressed at oral argument as to what Lashins might appropriately have been required to do at that juncture, New York contended that Lashins was obligated to pay some or all of the cost of the RI/FS undertaken at the behest of the EPA and the NYSDEC.
 
 
 49
 This is surely an anomalous proposal. Response costs are assessed when there is liability under § 9607(a). It is counterintuitive to suppose that a defendant is required to pay some or all of those response costs in order to establish the affirmative defense provided by § 9607(b)(3) to liability under § 9607(a), thereby rendering the affirmative defense partly or entirely academic.
 
 
 50
 Nor do we discern any policy reasons for imposing such a rule. We agree with HRW Systems, Inc. v. Washington Gas Light Co., 823 F.Supp. 318 (D.Md.1993), that the "due care" mandate of § 9607(b)(3) does not "impose a duty on a purchaser of land to investigate prior to purchase, in order to determine whether there is pollution on the land caused by someone with whom the purchaser is not in contractual privity." Id. at 349. No claim is made that Lashins' purchase of the Arcade deprived New York of any remedy available to it against any predecessor owners or operators under § 9607(a); consent decrees were in fact entered against Tripodi and Astrologo. It is surely the policy of CERCLA to impose liability upon parties responsible for pollution, see, e.g., DiBiase Salem Realty Trust, Civ. A. No. 91-11028-MA, 1993 WL 729662, at * 3 (D.Mass. Nov. 19, 1993) (collecting cases), rather than the general taxpaying public,but this policy does not mandate precluding a "due care" defense by imposing a rule that is tantamount to absolute liability for ownership of a site containing hazardous waste.
 
 
 51
 Finally, the cases cited by New York do not require the negation of Lashins' "due care" defense. None involved a defendant who played no role in the events that led to the hazardous waste problem and came on the scene after public authorities were well along in a program of investigation and remediation. Kerr-McGee Chemical Corp. involved a landowner who was aware of the environmental problem and made no attempt to address it after preliminary investigative efforts by federal and state authorities provided notice of the contamination. See 14 F.3d at 325 & n. 3. In A & N Cleaners, the defendant landowners' sublessee (who subsequently became a lessee) was operating the offending dry cleaning establishment throughout the entire period of the defendants' ownership. See 854 F.Supp. at 232. In DiBiase Salem Realty Trust, a portion of the pollution occurred after the landowner commenced ownership, see 1993 WL 729662 at * 1, and the landowner did nothing to address the problem after becoming aware of the hazardous wastes as a result of preliminary investigations by state authorities, see id.at * 7. Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837 (4th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), cited to us at oral argument, did not address any § 9607(b) issue. Lincoln Properties, invoked in a post-argument letter to the Court, simply ruled that measures taken by San Joaquim County, California with respect to contaminated wells and a sewer system satisfied its § 9607(b)(3) "due care" obligation. See 823 F.Supp. at 1543-44.
 
 
 52
 In sum, we perceive no basis for reversal of the district court's award of summary judgment to Lashins on the basis that Lashins satisfied its obligation to "exercise[ ] due care" with respect to the Arcade within the meaning of § 9607(b)(3).[7] In so ruling, we proclaim no broad rule of exemption from the liability imposed by § 9607(a). Rather, mindful of the mandate of § 9607(b)(3) that the "due care" inquiry focus upon "all relevant facts and circumstances" of the case presented for decision, we conclude that Lashins' "due care" obligation did not require it to go beyond the measures that it took to address the contamination problem at the Arcade, see supra note 6 and accompanying text, and to supplant, duplicate, or underwrite the RI/FS previously commissioned by the EPA and NYDESC to address pollution that ensued from activities which occurred more than fifteen years before Lashins purchased the Arcade.
 
 Conclusion
 
 53
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Jorling has been appointed as trustee for the natural resources of the State of New York pursuant to 42 U.S.C. § 9607(f)(2)(B)
 
 
 [2]
 Section 9607(a) provides in pertinent part:
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 (1) the owner and operator of a vessel or a facility, [and]
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ...
 ....
 ... shall be liable for--
 (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
 (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.
 
 
 [3]
 Section 9607(b) provides:
 There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--
 (1) an act of God;
 (2) an act of war;
 (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
 (4) any combination of the foregoing paragraphs.
 
 
 [4]
 This cross-appeal was assigned docket number 95-7768, and is reflected in various ways in the caption of this appeal
 
 
 [5]
 In October 1993, Lashins sued Hocherman and his firm for malpractice, alleging that Hocherman had failed to advise Lashins about the receipt and contents of the Mazin letter
 
 
 [6]
 There appears to be no serious dispute that in addition, Lashins regularly took water samples and had them analyzed by a laboratory for VOC contamination, instructed all tenants to avoid discharging hazardous substances into the waste and septic systems, incorporated this requirement into the tenant leases, and conducted periodic inspections to assure compliance with this obligation
 
 
 [7]
 In view of the settlement with Astrologo and our affirmance of the summary judgment in favor of Lashins, New York's appeal from the district court's ruling "that Congress intended the right to a jury trial in a case where a plaintiff seeks a judgment for money damages for clean-up costs as well as injury to natural resources under [§ 9607(a) ]," Lashins Arcade Co., 881 F.Supp. at 102, and that "[w]ere this not so, this Court would find a Constitutional right to a jury trial," id. at 103, no longer presents a live issue for our resolution. We caution, however, that the district court's ruling stands alone (so far as we are aware) in opposition to the overwhelming weight of authority on this issue. See, e.g., Hatco Corp. v. W.R. Grace & Co.-Conn., 59 F.3d 400, 411-12 (3d Cir.1995); United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 749 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); United States v. Mexico Feed & Seed Co., 729 F.Supp. 1250, 1254 (E.D.Mo.1990); United States v. Northernaire Plating Co., 685 F.Supp. 1410, 1413 (W.D.Mich.1988), aff'd sub nom. United States v. R.W. Meyer, Inc., 889 F.2d 1497 (6th Cir.1989), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990)