IDYLWOODS ASSOCIATES, and
Kam Inc., Plaintiffs,

v.

MADER CAPITAL, INC., Slate Bottom Creek Apartments, Inc., Marc Equity Partners I, Trustees of the Mader Construction Corporation Employees Profit Sharing Plan (formerly the Mader Corporation Employees Profit Sharing Plan), Witben Realty Corporation, Sereth Properties, Inc., Wolsher, Inc., Universal Marion Corporation, American Premier Underwriters, Inc., and Louis E. Wolfson, Defendants.

No. 91–CV–364S(F).

United States District Court,
W.D. New York.

Feb. 26, 1997.

Phillips, Lytle, Hitchcock, Blaine & Huber (Robert E. Glanville, of counsel), Buffalo, NY, for Plaintiffs.

Duke, Holzman, Yaeger & Radlin (Peter G. Ruppar, of counsel), Buffalo, NY, for Mader Capital, Slate Bottom Creek Apartments,

Marc Equity Partners, Trustees of Mader Profit Sharing Plan.

Periconi & Rothberg, P.C. (James J. Periconi, of counsel), New York City, for American Premier Underwriters.

Harter, Secrest & Emery (Craig A. Slater, of counsel), Buffalo, NY, for Witben Realty, Sereth Properties, Wolsher, Inc., and Universal Marion Corp.

Connors & Vilardo (Lawrence J. Vilardo, of counsel), Buffalo, NY, for Louis E. Wolfson.

Williams & Connolly (Steven M. Umin, Dane H. Butswinkas, of counsel), Washington, D.C., for Louis E. Wolfson.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

The parties to this matter executed a consent to proceed before the undersigned on Defendants' summary judgment motions on March 6, 1995. The matter is presently before the court on Defendant Louis E. Wolfson's motion for partial reconsideration of the court's opinion of February 16, 1996 denying summary judgment, dated June 24, 1996; and on Defendants Universal Marion, Witben Realty Corporation, and Louis E. Wolfson's motion for partial reconsideration of the court's opinion of February 16, 1996 denying summary judgment on an affirmative defense raised by Defendants, dated September 17, 1996, and granting summary judgment to Defendant APU on Defendants' third-party defense.

### *BACKGROUND and FACTS*

This action alleging claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") was originally filed on June 5, 1991. An amended complaint was filed on March 8, 1993 adding Penn Central, Witben Realty, Sereth Properties, Wolsher, Inc., Universal Marion, and Louis E. Wolfson ("Wolfson") as party defendants. American Premier Underwriters, Inc. ("APU") was substituted for Penn Central, as a successor corporation, on May 18, 1994. On June 20, 1994, APU filed a cross-claim against Defendants Witben, Sereth, Wolsher, Universal Marion, and Wolfson alleging three causes of action, two claims under CERCLA and one state claim for contribution.

On April 17, 1995, APU filed a motion for summary judgment on its cross-claims under CERCLA. On the same day, Wolfson filed a motion for summary judgment on the ground that he was not liable to APU for any damages or costs under CERCLA or any other theory of liability. Witben, Sereth, Wolsher, and Universal Marion filed similar motions.

On February 16, 1996, this court issued a Decision and Order, granting APU's motion for summary judgment as against Witben and Universal Marion as the current owners of the property in dispute, as against Witben and Universal Marion as the current operators, and denying APU's motion for summary judgment against Wolfson as a current owner and/or operator. The court also denied APU's motion for summary judgment as against Witben, Universal Marion, and Wolfson as operators of a facility at the time of disposal of hazardous wastes. The court denied Wolfson's motion for summary judgment against APU. The court granted summary judgment against Universal Marion and Witben on the use of the third-party defense. The court also granted Wolfson's, Witben's, and Universal Marion's motions for summary judgment on the theory of passive disposal during Witben's ownership of the property. Finally, the court granted Sereth Properties' and Wolsher's motion for summary judgment.

On June 24, 1996, Defendant Wolfson filed a motion for reconsideration of that part of the court's opinion of February 16, 1996 that denied summary judgment on the issue of whether Wolfson may be liable as an operator under CERCLA. APU filed a memorandum in opposition to Wolfson's motion on July 12,1996. Wolfson filed a reply memorandum on July 19, 1996.

Thereafter, on September 17, 1996, Universal Madon, Witben, and Wolfson filed a motion for reconsideration of that part of the court's opinion of February 16, 1996 finding as a matter of law that Universal Marion and

Witben were not entitled to the third party/innocent purchaser affirmative defense and finding that genuine issues of material fact remained on the question of whether Wolfson may prevail on the third party/innocent purchaser defense, along with a memorandum of law, and a supporting affidavit. APU filed a memorandum in opposition to this motion on October 1, 1996. A reply memorandum, along with a second supporting affidavit, was filed on October 8, 1996.

Although Defendants requested oral argument, the court did not deem such argument necessary.

For the reasons as set forth below, Defendant Wolfson's motion to reconsider the court's February 16, 1996 Decision and Order is GRANTED, and upon reconsideration, the court declines to change its ruling. Defendants Witben, Universal Marion, and Wolfson's motion to reconsider the court's February 16, 1996 Decision and Order on the issue of the third party defense is also GRANTED, and upon reconsideration, the court adheres to its original ruling.

## DISCUSSION

The facts of this case were set forth in the court's February 16, 1996 Decision and Order, familiarity with which will be assumed. Defendants Wolfson, Universal Marion, and Witben now seek reconsideration of two issues which the court ruled upon in that Decision and Order.

It is well established that the function of a motion for reconsideration is to present the court with an opportunity to correct "manifest errors of law or fact or to consider newly discovered evidence...." *LoSacco v. City of Middletown,* 822 F.Supp. 870, 876–77 (D.Conn.1993), *aff'd,* 33 F.3d 50 (2d Cir.1994) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.,* 827 F.2d 246, 251 (7th Cir.1987)). The scope of review on motions for reconsideration is limited "to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging gaps of a lost motion with additional matters." *LoSacco, supra,* at 877 (quoting *Lund v. Chemical Bank,* 675 F.Supp. 815, 817 (S.D.N.Y.1987)).

**1.** ***Wolfson's Motion for Reconsideration of Operator Liability Under CERCLA***

CERCLA provides for the clean up of hazardous substances that threaten the environment and human health. *B.F. Goodrich Company v. Murtha,* 958 F.2d 1192, 1197 (2d Cir.1992). The statute imposes strict liability for the costs associated with responding to the release or threatened release of the hazardous substance. *B.F. Goodrich Co., supra,* at 1198; *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985). Liability for response costs may be imposed on various classes of responsible persons, including past and present owners or operators of facilities, transporters of hazardous substances, and those who generate or arrange for the disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a).

Persons who may be liable under CERCLA, or "covered persons," are classified into four categories: (1) the owner and operator of a vessel or a facility; (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at any facility; and, (4) any person who accepted any hazardous substances for transport to disposal or treatment facilities from which there was a release or a threatened release. 42 U.S.C. § 9607(a). A covered person may include an individual, corporation, or partnership. 42 U.S.C. § 9601(21).

In its February 16, 1996 Decision and Order, the court denied summary judgment to Wolfson on the issues as to whether Wolfson could be held liable as a present owner or operator of the hazardous waste site known as the Union Road Site. Wolfson's present motion requests reconsideration solely on the court's denial of summary judgment as to Wolfson's potential CERCLA liability as an "operator" of a "vessel" or "facility" under 42 U.S.C. § 9607(a)(1). Specifically, Wolfson asserts that there is no evidence to support the inference that Wolfson operated the Union Road Site at the time that Wolfson was brought into the lawsuit; that Wolfson can-

not be characterized as an operator as there were no operations at the Union Road Site at the time Wolfson was brought into the lawsuit; and, there is no evidence to establish any nexus between Wolfson and any activity at the Site. In response, APU argues that Wolfson has presented no evidence to show that he was *not* an operator of the Site at the time the lawsuit was initiated; that in order to sustain CERCLA liability, there is no requirement that operations be ongoing; and, lastly, that there is ample evidence establishing Wolfson's control over the Site and operations of Witben and Universal Marion, which the record shows were owners/operators of the Site, sufficient to preclude summary judgment.

On the first issue, Wolfson claims that, even if he is a current owner, he was not a current operator of the Union Road Site at the time that this lawsuit was commenced, and that therefore he cannot be liable as a current operator, citing *United States v. Fleet Factors Corp.,* 901 F.2d 1550 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). In *Fleet Factors,* the court determined to "construe the present owner and operator of a facility as that individual or entity owning or operating the facility at the time the plaintiff initiated the lawsuit by filing a complaint." *Fleet Factors, supra,* at 1554. Wolfson argues that, in 1993, at the time he was brought into this lawsuit as a party, he was 82 years old and did not exert any significant influence over either Witben or Universal Marion so as to be a current operator. Wolfson contends that the evidence submitted by APU to show that he was a current operator dated back to the 1970's and 1980's, and that there is simply no evidence to show that, in 1993, he operated the Witben property which contained the Union Road Site.

Under CERCLA, operator liability for a parent corporation or for a corporate officer based on actions of a corporation is generally reserved for those situations where the parent or corporate officer is deemed to have had substantial control over the facility in question. *Schiavone v. Pearce,* 79 F.3d 248, 254 (2d Cir.1996). In *Schiavone,* the Second Circuit subscribed to the views adopted by the First, Third, Fourth, Seventh, Eighth, and Eleventh Circuits, allowing direct operator liability on parent corporations and corporate officers. *Schiavone, supra,* at 255 (citing *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417 (7th Cir.1994) (direct operator liability for corporate officers and directors); *United States v. Carolina Transformer Co.,* 978 F.2d 832 (4th Cir.1992) (independent, personal operator liability for corporate principals)). The Second Circuit agrees that corporate officers and majority shareholders may be held liable as a direct operator under CERCLA. *State of New York v. Shore Realty Corp., supra,* at 1052 (stockholder of owner of property on which hazardous waste was found was liable as an operator under CERCLA). The Second Circuit has also stated that such a determination requires "an inherently fact-intensive inquiry." *Schiavone, supra,* at 255. Where key facts are in dispute, resolution of the issue should be left for the jury to determine. *Id.* Nonetheless, more is required than simple ownership and the general authority or control that comes with it, rather, there must be active involvement in the activities of the corporation which would be liable under CERCLA. *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corporation,* 90 F.3d 671, 674 (2d Cir.1996).

▌ In the February 16, 1996 Decision and Order, this court found that key facts as to the degree of control which Wolfson exerted over Universal Marion and Witben were in dispute, precluding summary judgment on the issue of both present owner and operator liability under CERCLA. The court finds that Wolfson has not submitted any new evidence on this issue to change this result. The fact that much of the evidence submitted by APU showed control over the two operations by Wolfson in the 1970's and early 1980's is irrelevant as APU was attempting to establish that Wolfson had ongoing control over the operations of Witben and Universal Marion. As Universal Marion voted to dissolve in 1984, it would be reasonable to assume that less activity was required after 1984 on the part of Wolfson as either an officer, director, or consultant. However, this fact does not alter the court's conclusion that there are significant facts in dispute as

to Wolfson's ultimate control over the operations of Universal Marion and Witben. The fact that, in 1993, Wolfson was 82 years old, standing alone, does not persuade the court that Wolfson's alleged control over these corporations would be any less. Indeed, Wolfson did not and has not submitted any evidence to show how he relinquished control over Universal Marion and Witben, and how he no longer has any more than minimal contact over day-to-day activities of these corporations.

Evidence in the record shows that every officer and director of Universal Marion knew Wolfson prior to taking their positions with Universal Marion and that such persons worked with Wolfson in other capacities besides their job functions at Universal Marion. However, there is other evidence in the record that Wolfson did not attend board of director meetings, and that his recommendations were not discussed at the board meetings. As such, based on this and other evidence in the record, the court maintains that a determination of this issue is not warranted on summary judgment, but, rather, requires a resolution of fact after trial.

The second issue raised by Wolfson is that, as there were no operations at the Union Road Site in 1993 when Wolfson was brought into the lawsuit, he cannot be found to be a current operator. Specifically, Wolfson claims that the site in question has lain dormant for years as land that was purchased for potential real estate development, and as such, there has been no activity at the site which could qualify as an "operation." APU asserts that CERCLA liability has been found in other cases where the facility contained only vacant or undeveloped land, and that the Union Road Site is a facility as defined by CERCLA. APU Memorandum of Law, at p. 7.

The court previously found that the Union Road Site was a facility as defined under the CERCLA statute. *See* Decision and Order, dated February 16, 1996, at p. 20. Wolfson does not contest the determination that the Union Road Site is a facility under CERCLA. Rather, Wolfson states that an individual cannot be an operator of an inactive site, and, as such, he cannot be found to be liable as an operator of a site where no operations took place.

An "operator" is defined as "one having active involvement in and control over the operations of a facility." *United States v. DiBiase,* 1993 WL 729662 at *6 (D.Mass. 1993), *aff'd,* 45 F.3d 541 (1st Cir.1995) (citing *United States v. Kayser–Roth Corp.,* 910 F.2d 24, 27–28 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991)). In *DiBiase,* an individual trustee was found to be an operator under CERCLA of a site which consisted of a parcel of undeveloped land, stating that the trustee had been responsible for decision-making at the site. *DiBiase, supra,* at *6. The court made no distinction regarding the fact that the site consisted of vacant land, finding that a person could be an operator based on his control over the site. The other cases cited by Wolfson, *United States v. Gurley,* 43 F.3d 1188 (8th Cir.1994), and *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 157 (7th Cir.1988), similarly state that a person may be liable as an operator under CERCLA where the individual has responsibility and extensive authority for actions taken at a hazardous waste site.

Wolfson has not cited, nor has the court's own research revealed, any authority for the proposition that simply because a site containing hazardous waste is vacant or undeveloped that an individual or corporation cannot be liable under CERCLA as an operator. By definition, the verb "to operate" means to "bring about by or as if by the exertion of positive effort or influence." *Gurley, supra,* at 1193. In denying Wolfson summary judgment on this issue in the original Decision and Order, the court determined that, based on the evidence of Wolfson's day-to-day control over Universal Marion and Witben, fact questions remained as to the extent of Wolfson's actual control, such as would "connote some type of action or affirmative conduct," *Gurley, supra,* at 1193, necessary to find operator liability under CERCLA. Wolfson has introduced no new evidence, nor has he shown that a manifest error of law was made in the court's original determination precluding summary judgment on this issue. As

such, there is no basis upon which to change the original Decision and Order.

Finally, Wolfson argues that the Second Circuit implicitly requires that a person have "knowledge or participation" of environmentally hazardous activities before CERCLA liability can be imposed upon that person as an operator. Wolfson contends that there is no evidence to show that Wolfson knew about or participated in activities at the Union Road Site, and thus, he cannot be liable as an operator under CERCLA. This argument was made in the memoranda supporting Wolfson's original motion. In the February 16, 1996 Decision and Order, the court noted that, in some cases, CERCLA liability had been imposed on shareholders who actually participated in management of the corporate owner or operator. Decision and Order, dated February 16, 1996, at p. 47 (citing cases).

The court found in its Decision and Order that material facts were in dispute as to the degree of control which Wolfson had over Universal Marion and Witben through his designated appointees. In denying summary judgment, the court stated that "while it appears that the most reasonable inference that can be made from the record is that Wolfson managed and controlled Universal Marion through his designated appointees, a finding by the court on this matter would go beyond that which is permitted on a summary judgment determination." Decision and Order, dated February 16, 1996, at p. 49. Wolfson has not submitted any new evidence or new case law to warrant reconsideration of this conclusion. The facts as set forth by Wolfson and APU sharply contrast on the issue as to whether Wolfson knew about the contamination at the Union Road Site, and whether Wolfson actively participated in the decision-making regarding the site. As such, there is no basis on which to grant summary judgment, and the court's prior ruling on Wolfson's motion will stand.

In conclusion, the court finds that Wolfson has not raised any newly discovered evidence or offered case law to support any finding that the court's Decision and Order on the issue of Wolfson's liability as an operator under 42 U.S.C. § 9607(a)(1) was a manifest error of law and/or fact. As such, Wolfson's

motion for reconsideration of this issue is GRANTED, and, upon such reconsideration, the court adheres to its Decision and Order entered February 16, 1996.

### 2. *Wolfson, Universal Marion, and Witben's motion for reconsideration*

Universal Marion and Witben, in their motion of September 17, 1996, seek reconsideration of that part of the court's February 16, 1996 Decision and Order which found as a matter of law that they were not entitled to the third party/innocent purchaser affirmative defense. Wolfson seeks reconsideration of the Decision and Order to find that genuine issues of material fact remain on the question of whether Wolfson may prevail on the third party/innocent purchaser defense. Universal Marion, Witben, and Wolfson request that the court enter judgment in their favor on that affirmative defense. These Defendants assert that the recent decision of *State of New York v. Lashins,* 91 F.3d 353 (2d Cir.1996), requires a fresh look at the statutory requirement of "due care" imposed upon a defendant asserting the third-party defense pursuant to 42 U.S.C. § 9607(b)(3). APU, in its response, asserts that the *Lashins* case does not warrant reconsideration of the February 16, 1996 Decision and Order, and, in fact, that *Lashins* supports this court's reasoning and conclusions in its opinion.

As previously stated in the court's February 16, 1996 Decision and Order, Section 9607(b)(3) provides an affirmative defense for a party who can establish that the offending "release . . . of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act or omission of a third party," provided that: (1) the third party is not "one whose act of omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant," (2) the defendant "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions," and (3) the defendant "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such haz-

ardous substance, in light of all relevant facts and circumstances." In concluding that Witben and Universal Marion were not entitled to assert the third party/innocent purchaser defense, the court found that, while Witben purchased the Union Road Site after the New York Central Railroad (APU's predecessor) had been continually dumping at the site for many years, "Witben did nothing when informed of unauthorized dumping at the site by third parties except to erect berms which were concededly knocked down by big trucks, and, upon being informed as early as 1982 of the discovery of the hazardous waste dump site, failed to cooperate in sealing off the area, and did not engage in any affirmative action to guard against a potentially dangerous situation, allowing over ten years to go by while various environmental agencies investigated the situation, during which time foreseeable weather conditions caused the hazardous waste to migrate." Decision, at p. 28. The court further noted that, "upon learning of the hazardous situation, Witben, and Universal Marion, decided to cease paying property taxes at the Site, hoping that County or Town officials would foreclose on the Site and take away any ownership responsibility." Decision, at p. 28. Concluding that, while the New York Central Railroad may have played a leading role in the contamination of the Site, Witben and Universal Marion contributed to the spreading of the contamination through their deliberate inaction, the court found that Witben and Universal Marion were not entitled to the third party/innocent purchaser affirmative defense. Defendants now submit newly discovered evidence, and also argue that the *Lashins* holding entitles them to raise the affirmative defense at trial.

The newly submitted evidence consists of three documents which were discovered in boxes stored in a self-storage area in Jacksonville, Florida by Richard Gray, Universal Marion's president. Counsel for Wolfson visited the storage area on August 14, 1996, and identified certain possibly relevant file folders which were then shipped to counsel's offices in Washington, D.C. during the last week of August or the first week of September, 1996. Affidavit of Dane Butswinkas, Esq., dated October 7, 1996, at ¶ 3.

Upon investigation of the file folders, counsel discovered a letter from Gray to James Oppenheimer, a Buffalo real estate broker, containing a Universal Marion check dated December 13, 1982 in the amount of $4,670 payable to a construction company for grading and placement of pole barriers at the northwest corner of Union Road and Gardenville Parkway West on the land owned by Witben. A remittance letter from Oppenheimer to the construction company was also discovered, dated December 16, 1982, forwarding the payment. Finally, another letter dated December 15, 1982, from Oppenheimer to Gray, was discovered where Oppenheimer informed Gray that the construction company had placed telegraph poles at the places where the property was accessible from the roads at grade, that signs had been placed indicating that no dumping was permitted, and that Oppenheimer had visited and alerted two nearby occupants in the park, asking them to secure license numbers and a description of anyone seen dumping on the land, along with visiting and sending a letter to the Chief of Police in an attempt to stop unauthorized dumping on the land. Exhibit 3, Butswinkas Affidavit. This evidence is not relevant to the issue of the hazardous waste dumping which had taken place during the 1950's and 1960's by the New York Central Railroad Company, but is relevant to the issue of unauthorized dumping on the land during the period of Witben's ownership of the land. In its discussion of how *Lashins* affects this court's previous determination, the court will consider this new evidence.

The defendant in *Lashins* was an individual who had purchased a one-story building housing six retail stores, known as the Arcade, in 1987. Prior to the defendant's ownership of the Arcade, a dry-cleaning business had operated as one of the retail stores from 1958 until 1971, under two separate ownerships. The second owner had apparently dumped powdered wastes from his dry cleaning machines on the ground outside the Arcade. In 1978, the Westchester County Department of Health noted possible groundwater contamination at the Arcade. In 1982, the New York State Department of

Environmental Conservation ("NYSDEC") authorized state funds for an investigation and remediation of the groundwater problem at the Arcade; the investigation was joined by the United States Environmental Protection Agency ("EPA") in 1986. A remedial investigation/feasibility study was ordered in 1986, and a consulting engineering firm began field work in the summer of 1987. Meanwhile, in 1984, the previous owner of the Arcade, pursuant to a request from the Westchester County Department of Health, installed a granular activated carbon filter in the well supplying the Arcade to remedy the contamination problem. Against this backdrop, the defendant purchased the property on June 26, 1987.

The defendant was first informed that the NYSDEC was conducting a formal investigation of the Arcade in August, 1987, shortly after his purchase of the property. Subsequent to his purchase of the Arcade, the defendant maintained the existing water filter, took water samples to be analyzed at a laboratory on a semi-annual basis, instructed all of his tenants to avoid discharging any hazardous substances into the waste and septic systems, incorporating this requirement into the tenant leases, and conducted periodic inspections of the tenants' premises to ensure compliance with the provision of the lease.

In 1992, the State of New York filed suit under CERCLA against the defendant and the Arcade's previous owners. The Second Circuit, affirming the holding of the district court granting summary judgment to the defendant, held that the defendant was entitled to summary judgment in his favor based on 42 U.S.C. § 9607(b)(3), the third party defense. In discussing the third party defense under § 9607(b)(3), the court noted that, to succeed under the third party defense, "the defendant must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." *Lashins, supra,* at 361. The court further observed that "due care would include those steps necessary to protect the public from a health or environmental threat," *Lashins, supra,* at 361 (citing *United States v. A & N Cleaners & Launderers, Inc.,* 854 F.Supp. 229, 238 (S.D.N.Y.1994)), and cited *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.* 14 F.3d 321, 325 & n. 3 (7th Cir.1994) for the proposition that due care is not established when no affirmative measures are taken to control a hazardous waste site. *Lashins, supra,* at 361.

The plaintiff, the State of New York, argued that the defendant, Lashins, inadequately investigated the contamination problem prior to his purchase of the property, and that, after its purchase, he "did nothing to contain, control or clean up the pollution except to continue to maintain a filter on its own property." *Lashins, supra,* at 361. However, the Second Circuit concluded that Lashins "due care" obligation did not require him to go beyond the measures that he took to address the contamination problem on the property. *Lashins, supra,* at 362. The court further stated that Lashins was not required to underwrite a remedial investigation/feasibility study previously commissioned by the EPA and the NYSDEC prior to Lashins' purchase of the property from activities that had occurred more than fifteen years before Lashins' purchase. *Lashins, supra,* at 362.

In this case, Witben, Universal Marion, and Wolfson contend that the *Lashins* decision requires that this court's order be vacated, and summary judgment on the third party defense be entered as to them on the basis that the pertinent language of § 9607(b)(3) focuses the due care inquiry upon all relevant facts and circumstances of the case at hand, and that whatever the facts and circumstances, the affirmative defense cannot be rendered "partly or entirely academic" by requiring the defendant to pay some of all of the response costs to prove that the defendant took affirmative steps necessary to establish the third party defense. The court disagrees and finds the facts in *Lashins* to be distinguishable from the instant case. Further, the court concludes that the holding in *Lashins* appears to be limited to its facts.

CERCLA is a strict liability statute with few defenses. As stated in *Lincoln Proper-*

*ties, Ltd. v. Higgins*, 823 F.Supp. 1528 (E.D.Cal.1992):

> [CERCLA] envisions that sometimes the cleanup must be paid for by those least responsible because those who are most responsible lack funds or cannot be found. It tempers its severity with an apportionment principle and with limited defenses that are rarely available.

*Lincoln Properties, Ltd., supra*, at 1537.

Further, "[a] CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845–46 (4th Cir.1992).

In *Kerr–McGee Chemical v. Lefton Iron & Metal*, 14 F.3d 321 (7th Cir.1994), cited with approval in *Lashins,* the defendants, Lefton Iron and Lefton Land, purchased an industrial site from a predecessor in interest with the plaintiff. Prior to the defendant's ownership of the land, the site had been used to manufacture wood products using a process that involved treating the wood with creosote and other wood preservatives. When the plant ceased operations, the manufacturer moved large quantities of the preservatives off the property, however, significant amounts of preservatives remained on the site. In 1988, the State of Illinois filed a complaint against the plaintiff and the defendants (two related companies) alleging various pollution complaints and seeking to hold them responsible for clean-up of the site. The plaintiff entered into a consent decree with the State of Illinois, and filed suit against the defendants. Lefton Land raised the third party/innocent landowner defense, which was successful at the trial level. Reversing the district court's ruling, the Seventh Circuit held that neither Lefton Iron nor Lefton Land were entitled to the innocent landowner defense. Noting that § 9607(b) required that an innocent landowner demonstrate, among other things, that it took precautions to prevent the "threat of release" or other foreseeable consequences arising from the pollution on the site, the court found that Lefton Land had failed to make such a showing, and that the evidence showed that "although Lefton Land was aware of the wood preservatives on the site, it made no attempt to remove those substances or to take any other positive steps to reduce the threat posed by the creosote." *Kerr–McGee, supra*, at 325. Similarly, Lefton Iron "was also aware of the wood preservatives on the site and made no attempt to remove the polluting chemicals," finding this sufficient to impose CERCLA liability. *Id.* The court also noted that Lefton Iron and Lefton Land "took no action to clean up the site even after the Illinois Environmental Protection Agency and the United States Environmental Protection Agency undertook preliminary investigations of the site," and that Lefton Iron and Lefton Land had a responsibility to take affirmative measures to control the pollution on the site. *Id.,* at 325 n. 3.

Noting that, under the facts present in *Lashins,* the Second Circuit stated that a party is not required to pay remediation costs in order to prove that it took affirmative steps to address a hazardous waste problem after receiving notice of the contamination, this court finds that the facts in this case are more similar to the facts in *Kerr–McGee* than those found in *Lashins.* In *Lashins,* the defendant, upon receiving notice that the groundwater around his property was contaminated, continued to maintain a water filter installed as part of the remediation of the land, and began to monitor his property, including inspecting the tenants' stores, and incorporating terms into the lease agreements with each tenant to ensure that no dumping of hazardous waste took place. Such actions represented affirmative action taken to prevent further contamination of the property. The Second Circuit, in affirming the defendant's entitlement to the third party defense, noted these actions, and held that the defendant was not required to pay further remediation costs for hazardous waste conditions which occurred and spread prior to his ownership.

In contrast, in the instant case, although it is clear that New York Central Railroad engaged in dumping activities at the Union Road Site prior to Defendants' ownership of the property, upon Defendants learning of the hazardous waste problem, rather than

taking affirmative steps to prevent continued contamination of the site, Witben and Universal Marion attempted to distance themselves from the property, going so far as to cease paying property taxes on the site, in the hope that town and county officials would foreclose on the property and take it off their hands. While in response to government environmental agencies' investigation, Universal Marion contracted with an environmental testing firm, Recra Research, to test the site, upon receipt of Recra's report, the attorney for Universal Marion, Charles Maxwell, delayed providing the report to the Erie County Health Department. The report itself recommended that Universal Marion remove the waste material from the "pit/lagoon" on the site, a recommendation that Universal Marion and Witben ignored, stating that it did not have the necessary funds. Deposition of Charles Maxwell, Notice of Motion for Partial Summary Judgment, dated April 17, 1995. The New York State Department of Environmental Conservation also requested that Universal Marion and/or Witben remove the tar materials from the depression at the site, remove any exposed drums, and dispose of the materials properly, however Universal Marion and/or Witben never responded to the request. Instead, Charles Maxwell directed Universal Marion to remove any "for sale" signs that might be on the contaminated property, and later, because he believed the property to be worthless, Maxwell advised Universal Marion to stop paying taxes on the property. Maxwell Deposition, at pp. 67, 77–78. Requests made to Universal Marion to place a fence and signs went unheeded until the town and environmental officials placed warnings on the property themselves. Instead, Universal Marion voted to dissolve the corporation and to begin to distribute assets to the shareholders for the sole purpose of liquidating the company and commencing the statute of limitations period during which the corporation could still be sued under CERCLA.

In affirming Lashins' use of the third party defense, the Second Circuit cited *Kerr–McGee Chemical Corp., supra*, stating that, in that case, the landowner was held liable under CERCLA and could not use the third party defense as the landowner was aware of the environmental problem and made no attempt to address it after preliminary investigative efforts by federal and state authorities provided notice of the contamination. *Lashins, supra*, at 362. In distinguishing *Kerr–McGee* from *Lashins*, the court found that *Kerr–McGee* did not involve a defendant who "played no role in the events that led to the hazardous waste problem and came on the scene after public authorities were well along in a program of investigation and remediation." *Lashins, supra*, at 362.

In the instant case, as soon as preliminary investigative efforts by federal and state authorities began, rather than to take affirmative steps to assist the investigation and clean-up, Witben and Universal Marion took affirmative steps to take themselves out of the picture, and to distance themselves from any potential CERCLA liability. There is evidence in the record that, during this period of uncooperation and inactivity, the contamination spread to a neighboring creek so that the remediation costs in 1993, when Defendants were brought into this action, were significantly greater than in 1984, when the investigation was begun. Witben and Universal Marion's own consultant told them what steps they should take to prevent further contamination to the environment from their property. Instead of taking the recommended action, they chose to do nothing and delayed transmitting the report to responsible authorities. As such, the court finds that Witben and Universal Marion acted more like the defendants in *Kerr–McGee* than the defendant in *Lashins*.

■ The new evidence set forth by Witben and Universal Marion is irrelevant to this issue. That evidence, which ascertains that Universal Marion placed telegraph poles at the northwest corner of the property to attempt to stop unauthorized dumping, does not address Witben's and Universal Marion's actions with respect the discovery of contamination at the property. Indeed, Witben and Universal Marion go to great lengths to argue that the unauthorized dumping that took place on the property during the 1970's and 1980's was not hazardous waste, but was merely trash and household items. As such, the fact that Universal Marion took some

action to deter the dumping does not negate the fact that, as to the contamination of the property, the main steps taken were to try to minimize, if not eliminate, any liability at all for clean-up at the site.

In summary, the *Lashins* decision, while providing a clear and concise ruling detailing the requirements of the third party defense, and what constitutes due care, did not ease the requirements of the defense or change the standards in making a due care determination. Nevertheless, the court must address the statement made in *Lashins* that "[i]t is counterintuitive to suppose that a defendant is required to pay some or all of those response costs in order to establish the affirmative defense provided by § 9607(b)(3) to liability under § 9607(a), thereby rendering the affirmative defense partly or entirely academic." *Lashins, supra,* at 361.

Based on this statement, Witben and Universal Marion argue that their actions were reasonable as they were not required to undertake any actions which constituted remediation at the property as they were not responsible for the pollution. But the issue here is not whether Witben and Universal Marion should be required to pay response costs in order to establish a due care defense. It is, rather, whether they failed to exercise due care and, as a result, will be required to share in response costs. Moreover, under CERCLA, it is clear that liability may attach even if the pollution was caused by another party. Indeed, the *Lashins* court itself states that "it is surely the policy of CERCLA to impose liability upon parties responsible for pollution rather than the general taxpaying public." *Lashins, supra,* at 361–62. The *Lashins* decision does not stand for the proposition that a current owner or operator of contaminated land may walk away simply because it believes that it did not cause the pollution, rather, the court made it clear that Lashins did not have to "go beyond measures *that it took* to address the contamination problem." *Lashins, supra,* at 362 (emphasis added). This court interprets that statement to acknowledge that the defendant in *Lashins* took affirmative steps to address the

contamination problem, unlike the actions of the instant Defendants. Further, as each inquiry on the issue of due care is dependent on the facts, the court does not read *Lashins* to hold that, as a rule, a party need not ever pay remediation costs in order to meet due care requirements. This would extend the provisions of the third party defense in a manner not envisioned by Congress, and, indeed, the *Lashins* court stated that, "we proclaim no broad rule of exemption from the liability imposed by § 9607(a)," and that a due care inquiry must be based upon "all relevant facts and circumstances." *Lashins, supra,* at 362.

■ The legislative history of § 9607(b)(3) confirms that, depending on the nature of the hazardous waste and other circumstances, "due care 'would include those steps necessary to protect the public from a health or environmental threat.'" *United States v. A & N Cleaners & Launderers, Inc., supra,* at 238 (quoting H.R.Rep. No. 253, 99th Cong., 2d Sess. 187 (1986) U.S.Code Cong. & Admin.News 1986, 2835). To borrow the *Lashins'* phraseology, it would be "counterintuitive" if a responsible party could assert a due care defense by refusing to take necessary steps simply because those steps later become components in a subsequent remediation plan, the costs of which may be assessed against the party. The statute makes the party's exposure to liability one of degree—if certain precautionary steps amounting to due care are taken, the party can avoid liability for response costs to remediate the remaining hazards.

In this case, in its February 16, 1996 Decision and Order, the court found that Witben and Universal Marion failed to take any affirmative steps upon their notification that their land contained hazardous wastes. Based on the *Lashins* decision, the court does not find any basis upon which to change its ruling as to the use of the third party defense by either Witben or Universal Marion. Accordingly, Defendants' motion for reconsideration is GRANTED and upon reconsideration, the court adheres to its prior ruling.[1]

---

1. Defendant Wolfson also argues that he is entitled to use the third party defense set forth in 42

U.S.C. § 9607(b)(3). In the February 16, 1996 Decision and Order, the court denied summary

## CONCLUSION

Defendant Wolfson's motion to reconsider the court's February 16, 1996 Decision and Order is GRANTED, and upon reconsideration, the court declines to change its ruling. Defendants Witben, Universal Marion, and Wolfson's motion to reconsider the court's February 16, 1996 Decision and Order on the issue of the third party defense is also GRANTED, and upon reconsideration, the court adheres to its original ruling.

The parties shall, within ten (10) days following receipt of this Decision and Order, contact the chambers of the Hon. William M. Skretny to calendar an appearance for the purposes of scheduling further proceedings. Alternatively, should the parties wish to exercise their option to consent to proceed before the undersigned, pursuant to 28 U.S.C. § 636(c), as to the trial of this matter, counsel shall contact the chambers of the undersigned to schedule further proceedings.

SO ORDERED.

judgment on this issue and held that a determination of Wolfson's use of this defense would be left at trial. The court does not disturb this ruling here.