**NIAGARA MOHAWK POWER COR-PORATION, Plaintiff–Counter– Defendant–Appellant,**

v.

**JONES CHEMICAL, INC., Defendant-Cross-Claimant-Counter-Claimant-Cross-Defendant,**

Beazer East, Inc., Defendant–Counter–
Claimant–Cross–Claimant,

Mohawk Valley Oil, Inc., Defendant-
Cross-Defendant-Cross-
Claimant-Appellee,

Suit–Kote Corporation, Defendant-
Cross-Defendant-Counter-
Claimant-Cross-Claimant,

City of Utica, Third–Party–Defendant–
Cross–Claimant,

Koppers Products Company, New York
State Department of Transportation
and New York State Thruway Author-
ity, Defendants–Cross–Defendants,

State of New York, Defendant,

Texaco, Inc. and New York State Canal
Corporation, Defendants–Cross–De-
fendants–Counter–Claimants–Cross–
Claimants.

Docket No. 01–7932.

United States Court of Appeals,
Second Circuit.

Argued: Sept. 13, 2002.

Decided: Jan. 07, 2003.

Warren Anthony Fitch, Swidler, Berlin, Shereff Friedman, Washington, DC, (Jerome C. Muys, Jr., Julie A. Weisman, on the brief), for Plaintiff–Counter–Defendant–Appellant Niagara Mowhawk Power Corporation.

Harold L. Segall, Beveridge & Diamond, P.C., Washington, DC, for Defendant–Cross–Defendant–Cross–Claimant–Appellee Mohawk Valley Oil, Inc.

Before VAN GRAAFEILAND, JACOBS, Circuit Judges, TRAGER, District Judge.*

DENNIS JACOBS, Circuit Judge.

Niagara. Mohawk Power Company ("NMPC"), having paid environmental costs for cleaning up the industrial peninsula and harbor at Utica Terminal, brought claims for contribution against (*inter alia*) Mohawk Valley Oil ("MVO") pursuant to the New York Navigation Law § 181 and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.* ("CERCLA"). The United States District Court for the Northern District of New York (Scullin, *J.*) granted summary judgment in favor of MVO. We affirm.

I

This case concerns liability for contamination of the Utica Terminal Harbor, which is formed by a peninsula that juts into the Mohawk River as it flows through Utica, New York. NMPC owned and operated a gas manufacturing and power generation business for over a century on a site that occupied most of the peninsula. Three sites, two of which were formerly owned by NMPC, are at issue in this appeal.

In 1961, MVO purchased from NMPC a parcel called Niagara Flats, a part of the peninsula on which NMPC had previously operated an oil refinery and petroleum storage facility. MVO removed the refinery equipment, but used the storage tanks (and a tanker-truck loading-station) in its

---

* The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

gasoline storage and transportation operations.

In 1965, MVO purchased another parcel on the peninsula from Texaco, Inc. (the "Texaco property"). Texaco used the property to store petroleum that it shipped via barges from an adjacent loading dock. MVO preserved and used several of the Texaco storage tanks.

Sandwiched between Niagara Flats and the Texaco property was a parcel owned by NMPC and leased during a relevant period to Tar Asphalt Services ("TAS"), a company in the business of manufacturing and laying asphalt.

MVO's operations at both Niagara Flats and the Texaco property consisted of storing No. 2 and No. 4 fuel oil, and transferring the fuel to container trucks and barges. At the height of its operation, MVO trucked and shipped tens of millions of gallons of fuel oil from these properties annually. MVO stopped using these properties in 1977, and sold them in 1987.

Contaminants common to both NMPC's gas manufacturing operations and MVO's storage and transportation operations were identified in samples of shallow soil and groundwater taken from the MVO properties. An environmental study commissioned by NMPC found BTEX and polyaromatic hydrocarbons ("PAHs") among the contaminants in the soil, groundwater and surface water—substances that are constituent elements of the No. 2 fuel oil stored by MVO as well as by-products of NMPC's manufactured gas plant operations. But there is no record evidence linking MVO's operations to the contamination of the Utica Terminal Harbor and peninsula. Thus, although No. 2 fuel oil was identified in samples drawn from the soil surrounding a bunker storage tank at Niagara Flats, a report commissioned by NMPC found that NMPC itself stored No. 2 fuel oil in that tank before it sold Niagara Flats to MVO. This was corroborated by the deposition testimony of a former MVO plant manager at Niagara Flats.

MVO offered evidence to show that its operations had caused no contamination of the harbor or peninsula. A 1990 Phase I investigation commissioned by the New York Department of Environmental Conservation noted that "[n]o allegation has been made of hazardous waste disposal or spillage" at either the Niagara Flats or Texaco properties. It concluded: "These data not only provide no direct evidence that the Mohawk Valley Oil site is the source of contamination, but virtually all measured parameters indicate that it is not."

This conclusion was corroborated by the deposition testimony of two former MVO employees, Steven Osley and Roger Munsell.

Osley, a former plant manager at Niagara Flats, testified "[n]o, [the storage tanks] didn't leak, no, no," and that as to the loading of fuel oil from the storage tanks onto tanker-trucks, "we never had any spills at the Niagara [Flats]." Osley never contradicted this testimony, though NMPC cites testimony by Osley that allows for the possibility of stray drops.

Osley did, however, testify to the discharge of hazardous substances into the harbor from truck-washing operations conducted by TAS on TAS property. Kerosene was used to remove tar from the TAS trucks and, when the trucks were rinsed, the run-off would flow downhill from the TAS property, onto Niagara Flats, and from Niagara Flats into the harbor. MVO learned of TAS's truck-washing operation when it purchased the Niagara Flats property from NMPC. At or about the time the MVO facility became operational a year later, MVO finished construction of a separator device designed to intercept the run-

off from TAS before it reached the harbor, and to separate the kerosene and tar from the water. Osley testified that the purpose of the separator was to catch contaminants from TAS's truck-washing operations "[a]nd anything that leaked off our trucks or something like that." Three or four years later, MVO built a berm to prevent the TAS run-off from reaching MVO's property.

Munsell, MVO's former manager of operations, testified that he was unaware of any spill while he was employed by MVO. Although he was never stationed at Niagara Flats or the Texaco property, Munsell testified that MVO "kept close track of every gallon" of fuel, and that the MVO monitoring systems were sensitive enough to pick up, on one occasion, the theft of four gallons of fuel.

Between 1989 and 1992, NMPC entered into four consent orders with the State of New York requiring environmental remediation of the harbor and the peninsula. NMPC in turn sued MVO, several other companies that owned or operated facilities on the peninsula, and various state agencies, claiming that they all had contributed to the contamination.

At the close of discovery, NMPC moved for summary judgment against three of the defendants, including MVO; MVO cross-moved. The court denied NMPC's motion as to MVO and granted MVO's cross-motion on the grounds that NMPC had failed to satisfy its burden on the Navigation Law claim and that MVO had successfully established the third-party defense under CERCLA. NMPC settled with the other defendants, and this appeal followed.

## II.

This Court reviews the district court's grant of summary judgment *de novo*. *See Young v. County of Fulton*, 160 F.3d 899,

902 (2d Cir.1998). In so doing, this Court construes the evidence in the light most favorable to the non-moving party, and drawing all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir.1998). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To survive summary judgment "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (italics in original) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998). The "mere existence of a scintilla of evidence" supporting the non-movant's case is also insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III

The New York Navigation Law imposes strict liability for clean-up and remediation costs on "[a]ny person who has discharged petroleum." N.Y. Navig. L. § 181(1). The statute defines a "discharge" as "any intentional or unintentional action or omission resulting in the releasing .... of petroleum into waters of the state or onto lands from which it might flow or drain into said waters...." *Id.* § 172(8). The term "waters" includes both surface and groundwater. *Id.* § 172(18); *see also Domermuth Petroleum Equip. and Maintenance Corp. v. Herzog & Hopkins, Inc.*, 111 A.D.2d 957,

490 N.Y.S.2d 54, 56 (3d Dep't 1985) ("Judicial notice can be taken of the common knowledge that oil can seep through the ground into surface and groundwater . . . .") (internal quotation marks and citation omitted).

The district court dismissed NMPC's New York Navigation Law claim for lack of evidence implicating MVO in the discharge of petroleum into the waters of the harbor and peninsula. The court relied on the deposition testimony of MVO's former employees, Osley and Munsell, that no spill or leak of fuel oil had occurred at Niagara Flats or the Texaco property during their service. It also noted the absence of any evidence that MVO—rather than NMPC or one of the other defendants—was responsible for the contamination. The court concluded that summary judgment against NMPC was appropriate because there was no evidentiary basis to dispute the sworn denials of Osley and Munsell.

On appeal, NMPC challenges the district court's conclusion on three grounds.

First, NMPC contends that Osley's testimony is hedged or contradictory in material respects. Thus, though Osley was emphatic that "[n]o, [the storage tanks] didn't leak, no, no," he conceded (when pressed) the possibility that oil may have seeped from the storage tanks: "if [the storage tanks] seep, [ ] just a little bit along the side, the wind would dry it off." Similarly, though Osley testified categorically that, in loading fuel oil from the storage tanks onto tanker trucks, "we never had any spills at the Niagara [Flats]," he conceded (when pressed) that there might have been fugitive drops from the loading pipeline or from loaded trucks as they pulled away (an amount he described as "[v]ery, very nil"). Osley further testified that to clean up these residual drops, he would "throw a little absorbent on there so it wouldn't eat up the blacktop driveway and [there] was very little, very little." Finally, NMPC cites Osley's testimony that the separator was built in part to catch "anything that leaked off our trucks or something like that."

■ Osley's testimony is not contradictory, and no part of it creates a material issue of fact as to whether MVO released petroleum into the waters of the state. An honest witness who testifies that he knows of no oil spills or discharges at a large oil storage facility may when pressed on cross-examination allow for the metaphysical possibility that such spills might have occurred or the likelihood that a drop here and there can have escaped. Speculation by a witness as to possibilities that the witness is not in a position absolutely to foreclose is not an admission that creates a genuine dispute of fact concerning an otherwise unequivocal denial. *See Kerzer,* 156 F.3d at 400 ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."). In particular, Osley allowed that if the tanks seeped, the moisture would be dried by the air; that fugitive drops from the loading pipeline and departing trucks were "[v]ery, very nil"; that any residual drops were mopped up from the driveway; and that the separator was built to protect against (*inter alia*) "anything that leaked off our trucks." NMPC nevertheless has not traced a drop of MVO petroleum to the soil or water, and cannot rely on the precautionary purpose of the separator in the absence of testimony that it remediated pollution emanating from MVO.

■ Second, NMPC points to evidence that No. 2 fuel oil was found in samples taken from the soil next to a Niagara Flats storage tank in which MVO stored No. 2 Fuel Oil. However, NMPC was itself a potential source of this oil: NMPC used Niagara Flats for fuel storage before selling it to MVO; Osley testified to pumping

out residue of No. 2 fuel oil from the Niagara Flats tank when MVO acquired the parcel; and an environmental study commissioned by NMPC confirms that NMPC stored No. 2 fuel oil in the Niagara Flats tank.[1]

Finally, NMPC argues that the presence of BTEX and PAHs in the surrounding environment permits an inference that MVO was the source of the contamination since these components were found in the fuel oil stored by MVO. However, these same substances are also by-products of NMPC's manufactured gas operations. NMPC argues that the question of whether these substances came from MVO, NMPC or some other defendant is for the fact-finder to resolve. But because there is no evidence that points to one party rather than another, the only basis for such a jury finding would be impermissible speculation.

It certainly seems probable, as NMPC argues, that MVO's operations—the storage and transfer of tens of millions of gallons of fuel oil annually at Niagara Flats and the Texaco property for 16 years—cannot have been done without some seepage or leakage onto the soil, and from there to the waters of the state. But it is NMPC's burden to show a discharge resulting in a release.

## IV

NMPC seeks CERCLA contribution from MVO for the run-off of kerosene that was used in cleaning TAS trucks and that traversed Niagara Flats to the harbor during the time MVO owned the property.

The district court granted summary judgment for MVO on the ground that MVO's construction of a separator and a protective berm satisfied the precautionary and "due care" requirements of the statutory third-party defense under CERCLA. NMPC challenges the district court's ruling on the ground that the measures taken by MVO to prevent contamination from the run-off did not constitute "due care" as a matter of law. Specifically, NMPC argues that our decision in *State of New York v. Lashins Arcade Co.*, 91 F.3d 353 (2d Cir.1996), requires a defendant to undertake remediation of the contamination for which it is being sued in order to satisfy the "due care" requirement and avail itself of the third-party defense.

The statute affords an affirmative defense for pollution solely caused by the act or omission of a third-party, but only

> if the defendant establishes by a preponderance of the evidence that (a) he exercised *due care* with respect to the hazardous substances concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and that consequences that could foreseeably result from such acts or omissions[.]

42 U.S.C. § 9607(b)(3) (emphasis added). NMPC argues that the measures taken by MVO were precautionary (in that they sought to prevent future contamination) but that they were not remedial in nature. NMPC thus claims that MVO cannot overcome the rule of *Lashins* that a defendant must incur remediation costs before it may be absolved of liability under CERCLA's third-party defense. We decline to decide that question or to consider whether due

---

1. NMPC argues that this environmental report is inadmissible hearsay, and may not be relied upon in granting summary judgment. However, the report appears to have been produced at the direction of NMPC, thus constituting a party admission. *See* Fed.R.Evid. 801(c)(2)(D).

care is satisfied where the principal measure taken—the construction of the separator—was completed a year after operations commenced. An alternative holding suffices.

We conclude that the following statutory texts are dispositive.

■ In order to establish liability under CERCLA, a plaintiff must make a *prima facie* showing that includes evidence that the defendant is a responsible party. *See ABB Indus. Sys., Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 356 (2d Cir.1997). CERCLA imposes liability on four classes of persons, including "any person who at the time of *disposal* of any hazardous substance *owned* or operated any *facility at which such hazardous substances were disposed of* [.]" 42 U.S.C. § 9607(a)(2) (emphasis added). "Disposal" in turn "means the discharge, deposit, injection, dumping, *spilling,* leaking, or placing" of contaminants into the surrounding environment. 42 U.S.C. § 6903(3) (emphasis added); 42 U.S.C. § 9601(29) (adopting definition of "disposal," for the purposes of CERCLA, from 42 U.S.C. § 6903(3)).

■ The critical facts are that the trucks were cleaned and rinsed on the TAS property, after which the contaminants flowed onto Niagara Flats to the harbor. The rinsing of kerosene and tar from the trucks arguably constituted a "spilling," and therefore a disposal, of a hazardous substance; but TAS—not MVO—was the *owner and operator* of the "facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). NMPC's argument might very well establish that TAS's truck-washing operations constituted a "disposal" on *TAS* property. It does not, however, establish that these same operations constituted a "disposal" on *MVO* property. "If a person merely controlled a site on which hazardous chemicals have spread without

that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability." *ABB,* 120 F.3d at 358–59.

As to the passage of the contaminants over or through Niagara Flats (which was owned by MVO at the time), it has not been shown that hazardous wastes were "disposed of" at Niagara Flats within the meaning of the statute. "[W]e must examine each of the terms in relation to the facts of the case and determine whether the movement of contaminants is, under the plain meaning of the terms, a 'disposal.'" *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 879 (9th Cir.2001) (*in banc*). "Disposal" is defined as the "discharge, deposit, injection, dumping, spilling, leaking, or placing." 42 U.S.C. § 6903(3). It cannot be said that any of these things were done on MVO's property. What happened on MVO's property in the relevant time was the flow of hazardous substances from TAS's property and the passive movement of the substances over or through MVO's property. Acts of "discharge," "deposit," "injection," "dumping," "spilling," and "placing" (all but "leaking") have in common that they are set in motion by human agency; and there is none in the passive flow of contaminated run-off across a property. The process of "leaking" seems to need no human agency, and in that sense may describe certain passive flows. But the word is inapplicable here because it denotes the passage of a substance into or out of a containment. *See* Random House Dictionary 815 (Unabridged Ed.1971) (defining a "leak" as, *inter alia,* "an unintended hole, crack, or the like, through which water, air, light, etc. enters or escapes"). True, the hazardous substances passed from the TAS property to Niagara Flats; but a property line itself is not a containment, certainly not for liquids. And the passive flow over and

through MVO's land is not a leakage either.

NMPC's CERCLA claim fails because no disposal occurred on MVO's premises, and therefore CERCLA liability cannot be imposed on MVO. NMPC's CERCLA claim against MVO must be dismissed.

\* \* \*

The judgment of the district court is affirmed.