**BRISTOL INVESTMENT FUND, INC., Plaintiff,**

v.

**CARNEGIE INTERNATIONAL CORP., Defendant.**

No. 02 Civ. 8891(SAS).

United States District Court, S.D. New York.

Oct. 30, 2003.

Thomas J. Fleming, Olshan Grundman Frome Rosenzweig & Wolosky, LLP, New York City, for Plaintiff.

Robert Frey, William Murphy Jr. & Associates, P.A., Baltimore, MD, for Defendant.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

■ Plaintiff Bristol Investment Fund Limited ("Bristol") filed this breach of contract action against Carnegie International Corporation ("Carnegie") on November 8, 2002. Bristol now moves for summary judgment.[1] In support of its motion, Bristol submits that there are no disputed issues of material fact, that Carnegie failed to perform as required under the terms of the contract, and that accordingly, Bristol is entitled to judgment as a matter of law. In response, Carnegie argues that its performance under the contract was excused because the contract is impermissibly usurious and therefore void. In the alternative, Carnegie argues that there are material questions of fact with respect to whether (1) the contract is usurious; (2) Carnegie is in default; and (3) Carnegie used its "best efforts" to fulfill its obligations under the contract.

For the reasons set forth below, Bristol's motion is granted and judgment is entered against Carnegie.

## I. FACTS

### A. The Parties

Bristol is a company organized under the laws of the Cayman Islands, with its principal place of business in George Town, Grand Cayman, Cayman Islands. *See* Kessler Dec. ¶ 2. Carnegie is a corporation organized under the laws of the State of Colorado, with its principal place of business in Laurel, Maryland. Carnegie is registered with the Securities and Exchange Commission and is publicly traded under the symbol "CGYC.KP." *See id.* ¶ 3.

---

1. Carnegie also seeks a change of venue to the District of Maryland, pursuant to 28 U.S.C. § 1404. In support of this request, Carnegie argues that certain third-party witnesses reside outside of New York and thus cannot be compelled to testify at trial, and that the District of Maryland is less congested than the Southern District of New York, and therefore is a more appropriate forum.

A change of venue is not warranted. It is undisputed that the transaction is governed by the following forum selection clause:

> The debenture shall be enforced, governed by and construed in accordance with the laws of the state of New York applicable to agreements made and to be performed entirely within such state, without regard to the principles of conflict of laws. The borrower hereby submits to the *exclusive jurisdiction* of the United States Federal Courts located in New York, New York with respect to any dispute arising under this debenture, the agreements entered into in connection herewith or the transactions contemplated hereby or thereby. Both parties *irre-*

*vocably waive the defense of an inconvenient forum* to the maintenance of such suit or proceeding.

Registration Rights Agreement ("RRA") ¶ 4.6, Ex. D to Declaration of Paul Kessler, a Bristol director, in Support of Plaintiff's Motion for Summary Judgment ("Kessler Dec.") (emphases added). This clause is a mandatory clause requiring adjudication in the New York Federal Courts. *See Baosteel America Inc. v. M/V Ocean Lord*, 257 F.Supp.2d 687, 689 (S.D.N.Y.2003). In seeking to transfer venue, Carnegie therefore has a very heavy burden "because in order to escape the contractual clause, it must show that 'the trial in the contractual forum will be so gravely difficult and inconvenient that [it] will for all practical purposes be deprived of [its] day in court.'" *New Moon Shipping Co. Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 32 (2d Cir.1997) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). Carnegie has failed to meet this burden. Indeed, it has not even argued that a trial of this action in the Southern District of New York will deprive Carnegie of a "its day in court." *Id.*

## B. The Contract

On December 28, 2001, Bristol and Carnegie entered into a Securities Purchase Agreement ("SPA"), Ex. A to Kessler Dec., pursuant to which Bristol received a Secured Convertible Debenture ("the Debenture"), in the principal amount of $250,000, that matured on December 28, 2002, *see* Ex. B to Kessler Dec. The Debenture required Carnegie to pay interest at a rate of 12% on the unpaid balance. *See id.* ¶ 1.

At the time the SPA was executed, Carnegie had 110,000,000 shares of common stock, 96,291,428 of which were issued and outstanding or reserved for issuance pursuant to Carnegie's stock option plans. *See* SPA § 3.C; Declaration of E. David Gable, Carnegie's Chairman, in Opposition to Plaintiff's Motion for Summary Judgment ("Gable Dec.") ¶ 19. Under the SPA, Carnegie was required, "subject to Shareholder Approval [as defined in the SPA]," to reserve 98,307,692 shares for issuance upon conversion of the Debenture. "Shareholder Approval" is defined in the "Covenants" of the SPA:

> [Carnegie] *shall* file a preliminary proxy statement with the SEC no later that [sic] January 15, 2002 and *shall* hold an annual or special meeting of its stockholders no later than March 1, 2002 (or, if [Carnegie] receives comments from the SEC with respect to the preliminary proxy statement, no later than forty-five (45) days following the resolution of clearance of all SEC comments) and use its *best efforts to obtain at such meeting such approvals of* [Carnegie's] *stockholders as may be required* to issue all of the shares of Common Stock issuable upon conversion or exercise of, or otherwise with respect to, the Debentures, the Warrants and the Investment Op-

tions ... If [Carnegie] fails to file the preliminary proxy statement, hold an annual or special meeting of its stockholders or respond to comments received from the SEC within the time periods specified in this Section [ ], Carnegie shall pay to [Bristol] [liquidated damages as defined in section 2(f) of the SPA].

SPA § 4(m) (emphases added).

In connection with the Debenture and SPA, Bristol and Carnegie also entered into a Registration Rights Agreement.[2] Under the RRA, Carnegie was obligated to file a registration statement with the Securities and Exchange Commission ("SEC") for the common stock underlying the Debenture within 30 days of the "Closing." *See* RRA § 2(a). The RRA defines the "Closing" as the "closing of the transactions contemplated by this Agreement." *See id.* ¶ 2(a) (citing SPA ¶ 1(c)). The "Closing" occurred on December 28, 2001. *See* Gable Dec. ¶ 8. The RRA further provides that Carnegie "shall use its best efforts to obtain effectiveness of the Registration Statement as soon as practicable." RRA ¶ 2(c). In the event that Carnegie fails to file the registration statement as required by the RRA, or the statement is not declared effective by the SEC within 90 days of the "Closing," the RRA requires Carnegie to pay damages to Bristol. *See id.*

Article III of the Debenture identifies ten separate "events of default," and states that,

> If *any* of the following events of default shall occur ... then, upon the occurrence and during the continuation of any Event of Default ... at the option of the Holders of a majority of the aggregate principal amount of the outstanding De-

---

2. The Debenture, SPA and RRA are integrated documents and form one inseparable transaction. *See* Gable Dec. ¶ 9 (citing SPA ¶¶ B, D; Debenture § 4.11; RRA ¶ A).

bentures issued pursuant to the Purchase Agreement exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice") . . . the Debentures shall become immediately due and payable and the Borrower shall pay to the Holder, in satisfaction of its obligations hereunder, [various damages].

Debenture Art. III (emphasis added). Included among the ten "events of default" is "Failure to Timely File Registration or Effect Registration." That provision states that a default occurs if,

The Borrower fails to file the Registration Statement within Forty-five (45) days following the Filing Date (as defined in the Registration Rights Agreement) or obtain effectiveness with the Securities and Exchange Commission of the Registration Statement within one hundred five (105) days following the Filing Date or such Registration Statement lapses in effect . . . for more than thirty (30) consecutive days or forty-five days in any twelve month period after the Registration Statement becomes effective.

Debenture, ¶ 3.3. Pursuant to Article III of the Debenture, failure to pay principal or interest due on the Debenture also constitutes an event of default. *See* Debenture, ¶ 3.1.

Finally, the SPA contains an integration clause stating that the SPA, the RRA and the Debenture,

contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither [Carnegie] nor [Bristol] makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the party to be charged with enforcement.

SPA § 8(e).

### C. Carnegie's Performance Under the Contract

Following execution of the SPA and the RRA and issuance of the Debenture, Carnegie did not file a preliminary proxy statement with the SEC and did not "hold an annual or special meeting of its stockholders," as required by section 4(m) of the SPA. Because the shareholder meeting was not held, Carnegie necessarily did not use its "best efforts" to obtain the shareholder approval needed to issue the 98,307,692 shares of stock underlying the Debenture, as required by section 4(m) of the SPA. Consequently, the shares were never issued. Moreover, because the shares were not issued, Carnegie could not file a registration statement for the shares with the SEC, *see* Gable Dec. ¶ 25, as required by section 2(a) of the RRA. Finally, because no registration statement was ever filed, Carnegie could not obtain an effective registration statement as required by section 2(c) of the RRA.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is permissible "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if "it 'might affect the outcome of

the suit under the governing law.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Once the moving party has met its burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Elec. Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 117 (2d Cir.2003). "The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). Moreover, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted). Conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact. *See Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

"Summary judgment is only proper in contract disputes if the language of the contract is 'wholly unambiguous.'" *Mellon Bank, N.A. v. United Bank Corp. of New York,* 31 F.3d 113, 115 (2d Cir.1994) (quoting *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985) and *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)). "If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (quoting *Seiden Assocs. v. ANC Holdings Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). "Ascertaining whether or not a writing is ambiguous is a question of law for the trial court." *Sayers,* 7 F.3d at 1094. "An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987). If the court finds that "the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence, and it may then award summary judgment." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir.2002) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998)).

In determining whether a genuine issue of material facts exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk,* 315 F.3d at 175.

Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.2000)).

### B. Usury

New York[3] General Obligation Law § 5–501 prohibits the charging of usurious interest on any "loan or forbearance." N.Y.G.O.L. § 5–501(1) (McKinney's 2003). However, pursuant to section 5–501(6)(a) of the General Obligation Law, where the loan or forbearance amounts to $250,000 or more, there is no limitation on the amount of interest that may be charged, except that the interest rate may not violate the criminal usury statutes.[4] An interest rate on any "loan or forbearance" that "exceed[s] twenty-five percent per annum or the equivalent rate for a longer or shorter period," constitutes criminal usury. *Id.*

Usurious loans are void. *See* N.Y.G.O.L. § 5–511; *see also Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48, 499 N.Y.S.2d 650, 490 N.E.2d 517 (1986) ("when a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoin prosecution on them and order that all documents and collateral be canceled and surrendered"); *Hufnagel v. George*, 135 F.Supp.2d 406, 407 (S.D.N.Y.2001) ("The New York Court of Appeals has confirmed that the transac-

tion must be deemed void if it is deemed usurious."). However, it is well established that the usury statutes do not apply to defaulted obligations. *See Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n. 3 (2d Cir.1986) ("[U]sury law does not apply to defaulted obligations. Because interest was charged only on [defendant]'s past due debts, the usury laws do not apply.") (citations omitted); *In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.*, 851 F.Supp. 556, 565 (S.D.N.Y. 1994) ("Any penalty interest rates or late fees assessed against the Plaintiffs do not constitute usury, since New York's usury statutes do not apply to defaulted obligations."); *Miller Planning Corp. v. Wells et al.*, 253 A.D.2d 859, 678 N.Y.S.2d 340, 341 (2d Dep't 1998) ("the defense of usury does not apply where, as here, the terms of the mortgage and note impose a rate of interest in excess of the statutory maximum only after default or maturity").

### C. Parol Evidence

Under New York law, "[i]f a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir.1993) (citing *Hudson–Port Ewen Assocs. v. Chien Kuo*, 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991) and *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). "That is, extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement." *Id.*; *see*

---

**3.** The parties agree that pursuant to the forum selection clause, *see supra* n. 1, New York law governs this diversity dispute. *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Mem.") at 4 n. 1; Plaintiff's Memoran-

dum of Law in Support of Summary Judgment ("Pl.Mem.") at 3.

**4.** *See* New York Penal Law §§ 190.40, 190.42 (McKinney's 2003).

*also Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996) (under New York law, "whether a contract is ambiguous is a matter of law for the court to decide, and parol evidence is not admissible to create an ambiguity"); *Mizuna, Ltd. v. Crossland Federal Sav. Bank,* 90 F.3d 650, 659 (2d Cir.1996) (parol evidence cannot be used to prove an oral condition precedent that contradicts or varies the terms of a written contract). Moreover, if a contract contains an integration clause and thus "recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (citing *Fogelson v. Rackfay Construction Co.,* 300 N.Y. 334, 340, 90 N.E.2d 881 (1950)).

## III. DISCUSSION

■ Carnegie concedes that it did not file a preliminary proxy statement with the SEC, did not hold an annual or special meeting of its stockholders as required for issuance of the shares underlying the Debenture, did not file a registration statement for the shares with the SEC, and did not obtain an effective registration statement. *See* Gable Dec. ¶¶ 6–9. However, Carnegie contends that these failures do not constitute a breach of the Debenture, SPA and RRA for three reasons. *First,* Carnegie argues that the entire transaction between Bristol and Carnegie is void because Bristol's loan to Carnegie is usurious. *See* Def. Mem. at 4–7; Gable Dec. ¶ 5. *Second,* Carnegie submits that it did not default on the loan. *See* Def. Mem. at 7; Gable Dec. ¶¶ 16, 17. *Third,* Carnegie claims that (a) obtaining shareholder approval for issuance of the shares underlying the Debenture was a condition precedent to all of its other obligations under the Debenture, SPA and RRA; (b) it was only required to use its best efforts to obtain such shareholder approval; and (c) because Carnegie did use its best efforts to obtain the shareholder approval but was nevertheless unable to do so, it satisfied all of its obligations. *See* Def. Mem. at 7–9; Gable Dec. ¶¶ 6–9, 18, 23–26. Carnegie further argues that, at a minimum, there are questions of fact as to whether (1) the transaction is usurious; (2) Carnegie defaulted on the loan; and (3) Carnegie used its best efforts to obtain the requisite shareholder approval, and that summary judgment is therefore inappropriate. I shall address each of these arguments in turn.

### A. The Loan Is Not Usurious

By its plain terms, the interest rate on the Debenture is 12%. *See* Debenture at 1. This rate is far less than the statutory maximum of 25%. *See* N.Y.G.O.L. § 5–501; N.Y.P.L. §§ 190.40, 190.42.

Nonetheless, Carnegie claims that the interest rate is usurious because the "additional payments" Bristol now seeks to recover from Carnegie as a result of Carnegie's failure to satisfy its obligations under the agreement "equate to an effective annual interest rate for the first twelve months of 35% per annum and thereafter at 36% per annum." Gable Dec. ¶¶ 27, 28. Carnegie submits that together, the payments that Bristol now seeks to recover from Carnegie pursuant to the Debenture, SPA and RRA amount to an "effective interest rate of at least 83.4%." *Id.* ¶ 30; Def. Mem. at 5.

In support of this argument, Carnegie claims that, at the time the parties entered into the transaction, Bristol was aware that Carnegie was in "dire financial straits," Def. Mem. at 4, and consequently knew that Carnegie would be unable to hold the shareholder meeting required to

issue the shares underlying the Debenture, *see id.* at 1–2, 4, 6. According to Carnegie, Bristol therefore expected that the damages provisions would be triggered, thereby entitling Bristol to an interest rate in excess of the statutory maximum. *Id.* Carnegie thus argues that, at a minimum, a jury should determine whether these "interest rates" are usurious. *See id.* at 6.

■ Carnegie's argument is unavailing. The fact that Bristol now seeks to recover damages that equate to an amount in excess of the statutorily permissible interest rate is not a violation of the New York usury laws, because "usury law does not apply to defaulted obligations." *Manfra,* 794 F.2d at 63 n. 3. *See also Integrated Res.,* 851 F.Supp. at 565; *Miller,* 678 N.Y.S.2d at 341. The damages about which Carnegie complains are available to Bristol *only because* Carnegie defaulted, and would not have been recoverable had Carnegie adhered to the terms of the agreements. Therefore, these damages are not subject to a usury analysis.

Moreover, Carnegie's argument that Bristol "knew" the damages provisions would be triggered, is misplaced. The SPA contains an integration clause stating that the Debenture, SPA and RRA "contain the entire understanding of the parties." *See* SPA § 8(e). Carnegie does not argue that it was fraudulently induced to enter into either the clause, or the agreements as a whole, and therefore it may not submit parol evidence to "vary, or [ ] escape from, the terms of the integrated contract." *Manufacturers Hanover Trust,* 7 F.3d at 315. Where, as here, the terms of the contract are unambiguous, the Court may not look to matters outside the agreement to create an ambiguity or alter the contract's meaning. *See Consarc,* 996 F.2d at 573; *Readco,* 81 F.3d at 299. Because the interest rate and various damages clauses in the Debenture, SPA and RRA are explicit and unambiguous, the transaction is not usurious as a matter of law.

## B. Carnegie Is in Default

■ Carnegie submits that Bristol held Carnegie in default and "demanded full payment of all sums due based upon the default provisions of the Debenture, although as of that date there was *no* monetary default by Carnegie." Gable Dec. ¶ 16 (emphasis in original). According to Carnegie, even at the time Bristol filed this action, "Carnegie was *not* in default of any monetary payment." *Id.* ¶ 17 (emphasis in original). Carnegie thus urges this Court to find that there is a question of fact as to whether Carnegie was in default at the time Bristol demanded full payment on the loan. *See* Def. Mem. at 7–9; Gable Dec. ¶¶ 15–17, 29. In support of this argument, Carnegie notes that New York courts "most commonly" refer to "default" in the "non-payment context," and argues that "defining default in the context of non-payment conditions violates the spirit, if not the letter of New York's laws on usury because it would allow lender [sic] to recoup interest in excess of what he could have legally claimed." Def. Mem. at 7 n. 3.

There is no doubt that under the terms of the Debenture, certain events constituted a default *even before any monetary payments were due.* In fact, although failure to pay principal or interest on the Debenture is identified as an event of default, *see* Debenture ¶ 3.1, nine other events, *any* of which could have occurred before the payment of principal or interest, also are identified as events of default, *see id.* Art. III. Under the plain, unambiguous language of the Debenture, Carnegie's failure to file a registration statement, or obtain an effective registration statement within the designated time, for the shares

underlying the Debenture, constituted a default. *See id.* ¶ 3.3. As such, Bristol properly held Carnegie in default at the time Carnegie failed to fulfill these obligations, despite the fact that no monetary payments of principal or interest were yet due.

### C. Carnegie's Obligations Were Not Subject to Its Best Efforts

■ Carnegie argues that under the SPA and RRA, it was "only obligated to make 'reasonable efforts' or 'best efforts' to hold a shareholders meeting to obtain its common stock registration." Def. Mem. at 2; *see also* Gable Dec. ¶ 6. In support of this argument, Carnegie claims that at the time the parties entered into the transaction, Bristol knew that a shareholder meeting was required to issue the shares underlying the Debenture, and was aware that Carnegie lacked the funds needed to hold such a meeting. *See* Def. Mem. at 8; Gable Dec. ¶¶ 20–22. Accordingly, Carnegie claims that Bristol expected only that Carnegie would use its best efforts to hold the meeting. *See id.* Carnegie submits that there is a question of fact as to whether it made reasonable efforts to hold the shareholder meeting, and that summary judgment is therefore inappropriate. *See* Def. Mem. at 8–9.

Carnegie further claims that issuance of the shares underlying the Debenture was subject to shareholder approval at the shareholder meeting, and that in the event the approval was not obtained, Carnegie's obligations were excused because without such approval, it could not file a registration statement or obtain effective registration.[5] *See id.*

Carnegie's argument contradicts the *plain language* of the SPA. Section 4(m) of the SPA states, in pertinent part,

> [Carnegie] *shall* file a preliminary proxy statement with the SEC no later that [sic] January 15, 2002 and *shall* hold an annual or special meeting of its stockholders no later than March 1, 2002 ... and use its best efforts to obtain at such meeting such approvals of the Company's stock holders as may be required ...

SPA § 4(m). Thus, the obligations to file the preliminary proxy statement and *hold* the shareholder meeting were not subject to Carnegie's reasonable or best efforts, but rather were explicit requirements under the SPA. Moreover, because the SPA is an integrated contract, and because it is unambiguous, the Court need not and cannot consider parol evidence to alter or interpret this express language. *See Readco*, 81 F.3d at 299; *Manufacturers Hanover Trust*, 7 F.3d at 315; *Consarc*, 996 F.2d at 573. Thus, whether Bristol was aware of Carnegie's financial state and therefore expected only that Carnegie would use its best efforts to hold the shareholders meeting, is irrelevant.

Because Carnegie failed to file the preliminary proxy statement and hold the shareholder meeting, shareholder approval for issuance of the shares underlying the Debenture *could not* be approved. Carnegie is therefore responsible for all of the consequences that flow from such failures, and cannot claim that the lack of shareholder approval excused any aspect of its performance under the contract.

---

**5.** Bristol argues that under the plain language of the RRA, no shareholder approval was required to file the registration statement. *See* Plaintiff's Reply Memorandum in Further Support of Summary Judgment at 4–6. I need not reach this issue, however, because even if such shareholder approval was required for registration, Carnegie failed to hold the meeting required to obtain such approval, in breach of the agreement. *See infra.*

## IV. DAMAGES

### A. Applicable Law

#### 1. Date Limitations on Recovery

■■ Under New York law, a plaintiff may recover damages that accrue only up until the commencement of the action. *See Ewanski v. Solvay Process Co.*, 227 A.D. 597, 238 N.Y.S. 508, 511 (4th Dep't 1930) ("In an action at law, a recovery may only be had for the amount due at the time of the commencement of the action, or the damage which has accrued up to that date."). However, in a breach of contract action between a creditor and debtor where the underlying loan agreement provides for interest, the creditor can continue to collect the *interest* up until the time liability is established. *See Spodek v. Park Property Dev. Assocs.*, 96 N.Y.2d 577, 733 N.Y.S.2d 674, 759 N.E.2d 760 (2001). Moreover, pursuant to section 5001(a) of New York's Civil Practice Law and Rules, the creditor may recover prejudgment statutory interest on both the underlying damages that accrued up until the date the action was commenced, and the contractual interest that continues to accrue until judgment is entered against the debtor. *See* N.Y. C.P.L.R. § 5001(a) (McKinney's 2003); *Spodek*, 96 N.Y.2d at 581–82, 733 N.Y.S.2d 674, 759 N.E.2d 760. The statutory prejudgment interest rate is nine percent per annum. *See* N.Y. C.P.L.R. § 5004 (McKinney's 2003).

#### 2. Liquidated Damages and Unconscionability

■■■ A liquidated damages provision is "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of a breach of the agreement." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977); *see also Howard Johnson Int'l Inc. v. HBS Family, Inc.*, No. 96 Civ. 7687, 1998 WL 411334, at *5 (S.D.N.Y. July 22, 1998) (Sotomayor, D.J.). It is a well established principle of New York law that "[p]arties to a contract have the right to agree to [liquidated damages] clauses, provided that the clause is *neither unconscionable nor contrary to public policy.*" *Truck Rent-A-Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (emphasis added) (citing *Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485, 93 N.E. 81 (1910)). A damages clause is contrary to public policy when its purpose is not to compensate the injured party for the breach, but rather to "impose a penalty on the breaching party by requiring payment of a sum of money 'grossly disproportionate to the amount of actual damages.'" *In re T.R. Acquisition Corp.*, No. 02 Civ. 8487, 2003 WL 21910860, at *6 (S.D.N.Y. Aug. 8, 2003) (quoting *Truck Rent-A-Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015).

■■ A liquidated damages clause will be sustained only where:

(1) the agreed sum is a reasonable estimate of potential damages, i.e. not plainly or grossly disproportionate to the possible loss; and (2) actual damages are difficult to determine, or are not readily ascertainable ... [C]ourts must measure the validity of a liquidated damages clause as of the time the parties entered into the agreement at issue, not at the time of the breach, and [ ] such a determination is a matter of law to be decided by the court.

*Howard Johnson*, 1998 WL 411334 at *5 (citations omitted). Moreover, any doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of a construction which holds that the provision is a penalty.

*See id.* (citing *Multi Comm. Media Inc. v. AT & T Corp.*, No. 96 Civ. 2679, 1997 WL 188938, at *14 (S.D.N.Y. Apr. 18, 1997) ("New York courts construe ambiguous liquidated damages clauses as invalid penalty clauses"); *139 Fifth Avenue Corp. v. Giallelis*, No. 94 Civ. 7956, 1996 WL 154108, at *4 (S.D.N.Y. Apr. 3, 1996) ("if there is any reasonable doubt as to whether the clause imposes a penalty, courts should construe the provision as a penalty"); *Rattigan v. Commodore Int'l Ltd.*, 739 F.Supp. 167, 169–70 (S.D.N.Y.1990) ("Courts have tended, in doubtful cases, to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages, even where the parties have styled it liquidated damages rather than a penalty."); *Vernitron Corp. v. CF 48 Assoc.*, 104 A.D.2d 409, 478 N.Y.S.2d 933, 934 (2d Dep't 1984); *National Telecanvass Assoc. v. Smith*, 98 A.D.2d 796, 470 N.Y.S.2d 22, 24 (2d Dep't 1983)).

## B. Discussion

Under the terms of the SPA, RRA, and Debenture, Bristol seeks to recover the principal amount of its loan to Carnegie, liquidated damages, interest, and attorneys' fees.[6] Bristol also seeks statutory prejudgment interest. Under New York law, Bristol may recover the principal amount of its loan, the liquidated damages as calculated on the date this action was commenced (so long as these damages do not constitute an unenforceable penalty), the contractual interest up until the date of this Order, and prejudgment interest on all of the damages, beginning on the date the action was commenced. Bristol filed this action on November 8, 2002.

---

6. I will not address Bristol's claim for attorneys' fees at this time because Bristol has requested that I defer ruling on attorneys' fees

### 1. The Debenture Default Sum

██ Pursuant to section 3.3 of the Debenture, Carnegie's failure to file a registration statement within 45 days of the "Filing Date" constituted a default. Bristol notified Carnegie of its default on November 4, 2002, thereby triggering the default provision. *See* 10/14/03 Letter from Thomas Fleming, counsel to Bristol, to the Court ("10/14/03 Ltr.") at 4. Under the terms of the Debenture, Bristol is therefore entitled to 135% of the sum of (1) the then outstanding principal amount of the Debenture; (2) accrued and unpaid interest on the unpaid principal amount of the Debenture to the date of payment; (3) default interest, if any, on the outstanding principal and/or the accrued and unpaid interest; and (4) any amount owed under section 2(c) of the RRA as of the date of default. *See* Debenture Art. III. However, because I conclude that section 2(c) of the RRA constitutes an unenforceable penalty, *see infra* Part IV.B.3, I do not include the amount owed under that section in calculating the Debenture default sum. Therefore, as of November 4, 2002, the outstanding principal was $250,000, there was no accrued and unpaid interest on the unpaid principal, there was no default interest, and no amount may be collected under section 2(c) of the RRA. The default sum amounts to $337,500 ($250,000 × 1.35).

### 2. Interest on the Debenture

Bristol is entitled to recover the interest provided for under the terms of the Debenture. The outstanding principal is $250,000. Under the terms of the Debenture, in the event of default, interest accrues on the outstanding principal at a rate of 15% per annum. *See* Debenture. This interest began to accrue on Novem-

---

until after a disposition of the pending summary judgment motion.

ber 4, 2002, the date Bristol notified Carnegie of the default, *see* 10/14/03 Ltr. at 4, and continued to accrue until the date of this Order, *see Spodek,* 96 N.Y.2d at 581–82, 733 N.Y.S.2d 674, 759 N.E.2d 760. The interest therefore amounts to $102.74 per diem (($250,000 × .15)/365 days). As of the date of this Order, 359 days have elapsed since November 4, 2002. The interest therefore amounts to $36,883.66.

Pursuant to N.Y. C.P.L.R. §§ 5001, 5004 and *Spodek,* 96 N.Y.2d at 581–82, 733 N.Y.S.2d 674, 759 N.E.2d 760, Bristol is entitled to prejudgment interest on this amount, at the rate of nine percent per annum, beginning on November 8, 2002, the date this cause of action commenced. Because the underlying amount is a stream of payments, under N.Y. C.P.L.R. § 5001(b), the prejudgment interest is calculated based on a "single reasonable intermediate date." *Id.* Thus, I calculate the prejudgment interest as of May 13, 2003, the approximate midpoint between the date the action was filed and the date of this Order. As of May 13, 2003, the underlying interest on the Debenture amounted to $19,520.60 ($102.74 per diem × 190 days). The statutory interest on this amount, at the rate of 9% per annum, amounts to $1,707.55 ($4.81 per diem (($19,520.60 × .09)/365) × 355 days).

### 3. Bristol's Liquidated Damages Under the RRA and SPA

 Pursuant to section 2(c) of the RRA and section 4(m) of the SPA, Bristol is entitled to liquidated damages as a result of Carnegie's failure to (1) make the required SEC filing within 30 days of the closing, and (2) file a proxy statement by January 15, 2002. These damages continue to increase on a monthly basis, such that as of the date of this Order, the liquidated damages under the RRA and SPA amount to approximately $68,000 and $73,000, respectively. Moreover, Bristol seeks statutory prejudgment interest on these amounts, which amounts to approximately $12,400. Bristol thus seeks a grand total of about $153,400 pursuant to the RRA and SPA liquidated damages provisions, and related interest.

These additional damages, characterized as "liquidated damages," are unconscionable. There is no doubt that these damages constitute a penalty, and are not intended to compensate Bristol for Carnegie's breach. After all, Bristol already is entitled to the Debenture default sum (which is 135% of the loan that Bristol extended to Carnegie), and 15% interest on the outstanding principal. To award these additional "liquidated damages" under the RRA and SPA would provide Bristol with a recovery that is "grossly disproportionate to the amount of actual damages." *Truck Rent–A–Center,* 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015.

### C. Total Damages

Bristol's total damages under the Debenture amount to $374,383.66 ($337,500 (the Debenture default sum) + $36,883.66 (the outstanding interest on the Debenture)). Bristol's total statutory interest, pursuant to N.Y. C.P.L.R. §§ 5001, 5004, is $1,707.55.

### V. CONCLUSION

For the foregoing reasons, Bristol's motion for summary judgment is granted, and judgment is entered against Carnegie in the amount of $376,091.21, inclusive of statutory interest. The Clerk of the Court is directed to close this motion. Bristol must submit its request for attorneys' fees by November 15, 2003.